670 So.2d 1358 (1996)
Mary J. CRAVEN, Plaintiff-Appellant,
v.
UNIVERSAL LIFE INSURANCE COMPANY, Defendant-Appellee.
No. 95-1168.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1996.
Rehearing Denied April 24, 1996.
*1360 Rudie Ray Soileau, Jr., Lake Charles, Mary J. Craven.
Peter A. Ciambotti, Lake Charles, Universal Life Insurance Company.
Before PETERS, AMY and SULLIVAN, JJ.
AMY, Judge.
This is a sexual harassment case. The main issue on appeal is whether the jury was clearly wrong in finding that the sexual harassment that plaintiff suffered at work did not affect a term, condition, or benefit of her employment. We find that defendant's supervisory employee's harassment did affect a term, condition, or benefit of plaintiff's employment. Therefore, we conduct a de novo review of the record and award appropriate damages to the plaintiff.

DISCUSSION OF THE RECORD
In 1983, Mary Craven interviewed for a job with Universal Life Insurance Company [Universal Life]. Mary was eventually hired by Charles Kerlegon as a secretary/cashier for Universal Life's Lake Charles, Louisiana office. Mary's job duties primarily consisted of collecting insurance premiums from customers, preparing bank statements, and performing all the paper work for that office. Charles Kerlegon was the district manager for Universal Life of the Alexandria, Lafayette, and Lakes Charles offices. Kerlegon's duties were to recruit and train insurance agents and to promote sales of insurance policies. He also set the hours that Mary worked and would dictate the paper work that she would perform.
Mary and Kerlegon had a "business relationship" until the latter part of 1986 when Kerlegon began making suggestions that Mary have sex with him. In exchange, Kerlegon promised that Mary would receive job promotions and raises. Kerlegon engaged in these conversations with Mary only after all the sales agents had left the office for the day. Under Universal Life's business structure, Kerlegon did not have the direct authority to give Mary a promotion or raise. However, he had the authority to "recommend" *1361 to the proper officials at Universal Life that Mary was entitled to a promotion and/or raise.
Kerlegon continued to make these improper advances notwithstanding the fact that Mary repeatedly refused these requests. During this time, Universal Life had a policy regarding sexual harassment that was distributed to all of its employees. This policy defined sexual harassment and set forth a complaint procedure for any employee who felt that they suffered sexual harassment at work.[1] When Kerlegon persisted in requesting a sexual relationship in exchange for a job promotion and/or raise, Mary sought legal advice from an attorney. On the advice of her attorney, Mary began tape recording her conversations with Kerlegon. Mary then brought some of the tapes to her attorney.
As a result, by a letter dated September 30, 1987, Mary's attorney informed G.T. Howell, the vice-president of Universal Life, that Kerlegon was sexually harassing Mary at work. Subsequently, Howell assigned this complaint to Willie Irons, Universal Life's regional director for the Louisiana area. Irons then met with Mary's attorney and listened to one of her tapes. Irons determined that Kerlegon's statements were "inappropriate," and as such, Universal Life issued a written warning to Kerlegon to immediately terminate these improper comments. Further, Kerlegon was placed on six months of probation for his improper conduct toward Mary. However, they continued to work in the same office, and Mary felt hurt and angry because of Kerlegon's harassment.
Mary began to see Dr. Giles R. Morin, a psychiatrist, to help relieve her anger and depression. Dr. Morin saw Mary approximately once a month beginning in November 1987. Mary continued to work at Universal Life until July 29, 1988, when she was admitted to Charter Hospital at the request of Dr. Morin.

PROCEDURAL HISTORY
On February 17, 1988, Mary brought a sexual harassment suit against Universal Life, requesting damages under La.R.S. 23:1006. In her petition, Mary specifically pled:
During the months of June, July and August, 1987, and continuing to the present time, Charles Kerlegon has made explicit requests for sexual favors of the plaintiff herein and has demanded that plaintiff engage in sexually promiscuous activities with him in exchange for advanced job *1362 opportunities. His persistent conduct has been so egregious that it has created a hostile and offensive working environment which is sexually abusive to plaintiff herein and demeaning to her character as an employee.
The sexual harassment perpetrated by Charles Kerlegon is so severe and pervasive that it has created an abusive working environment and has altered the condition of plaintiff's employment to the extent that she has had to seek psychiatric and medical attention.
Universal Life answered the suit, denying all of Mary's allegations of sexual harassment. Universal Life also filed a motion for summary judgment which was denied by the trial court.
A trial on the merits was heard on April 10, 11, 12, and 13, 1995. After hearing all of the evidence, the jury found that (1) Mary was subject to unwelcome sexual harassment and (2) the harassment was based upon sex. However, the jury found that Kerlegon's harassment did not affect a term, condition, or privilege of Mary's employment. Therefore, on April 24, 1995, the trial judge rendered judgment encompassing the jury's verdict. The trial judge entered judgment in favor of Universal Life and against Mary at her cost; dismissed Mary's claim for attorney's fees at her cost; and fixed the expert witness fee of Dr. Morin at $250.00. On May 5, 1995, Mary filed a motion for a new trial or a judgment notwithstanding the verdict. The trial court denied these motions.
Mary appeals from that judgment and asserts a variety of assignments of error that deal with jury instructions, the trial court's refusal to allow the jury to hear certain evidence, and the trial court's decision to exclude certain testimony. However, the crux of Mary's appeal is that the jury committed manifest error by not finding that Mary suffered quid pro quo harassment at the hands of Kerlegon thereby affecting a term, condition, or privilege of her employment. Since the case turns on this crucial issue, we need only address this particular argument.

HARASSMENT CLAIM
La.R.S. 23:1006, which prohibits discrimination in employment on account of race, color, religion, sex, or national origin, states, in pertinent part, that:
B. It shall be unlawful discrimination in employment for an employer to:
(1) Intentionally fail or refuse to hire, refer, discharge, or to otherwise intentionally discriminate against or in favor of an individual with respect to compensation, terms, conditions, or privileges of employment, because of race, color, religion, sex, or national origin; or
(2) Intentionally limit, segregate, or classify an employee in a way which would deprive an individual of employment opportunities, give favor or advantage to one individual over another, or otherwise adversely or favorably affect the status of an employee because of race, color, religion, sex, or national origin.
Louisiana's anti-discrimination statute is similar to the federal statute prohibiting sex discrimination in Title VII of the Civil Rights Act of 1964, U.S.C. § 2000e, et. seq. As such, Louisiana's courts have properly looked to the federal statute to ascertain whether a valid claim for sexual harassment has been asserted. Spears v. Rountree Olds-Cadillac, 26,810 (La.App. 2 Cir. 4/5/95), 653 So.2d 182; Alphonse v. Omni Hotels Management Corp., 94-0157 (La.App. 4 Cir. 9/29/94), 643 So.2d 836.
Under Title VII, the jurisprudence recognizes two types of sexual harassment which affect the "compensation, terms, conditions, or privileges of employment," namely: (1) quid pro quo harassment, which occurs when an individual explicitly or implicitly conditions a job, job benefit, or the absence of job detriment, upon the employee's acceptance of sexual conduct; and (2) hostile environment harassment, which consists of verbal or physical conduct that has the effect of creating an intimidating, hostile, or offensive work environment. Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Bustamento v. Tucker, 607 So.2d 532 (La.1992).
*1363 To prevail in a hostile environment harassment claim, the plaintiff must assert and prove that: (1) she belonged to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the sexual harassment and failed to take proper remedial action. Polk v. Pollard, 539 So.2d 675 (La.App. 3 Cir. 1989). In Brown v. Vaughn, 589 So.2d 63, 65 (La.App. 1 Cir.1991), the first circuit explained how a hostile work environment affects a term, condition, or privilege of employment:
The type of conduct constituting such harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. Such misconduct constitutes sexual harassment regardless of whether it is directly linked to the grant or denial of an economic quid pro quo, if the purpose or effect of the misconduct is to unreasonably interfere with an individual's work performances or to create an intimidating, hostile, or offensive work environment. Every act of harassment, although reprehensible, does not necessarily give rise to a hostile environment claim. To be actionable, the harassment must be sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive, hostile environment.
In general, hostile environment harassment is characterized by multiple and varied incidents of offensive conduct which have the cumulative effect of creating a hostile working environment for the employee thus victimized. [Citations omitted].
In determining whether an environment is hostile, several factors are relevant in the inquiry: (1) frequency of the discriminatory conduct; (2) the severity; (3) whether the conduct is physically threatening, or a mere offensive utterance; (4) whether the conduct unreasonably interferes with an employee's work performance; and (5) the conduct's effect on the employee's psychological well being. Harris v. Forklift Systems, Inc., ___ U.S. ___, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
We have conducted an exhaustive search for a Louisiana case which enunciates the elements of a quid pro quo harassment claim; however, we have not found one. Under the federal jurisprudence interpreting Title VII, the following elements are necessary to prove a quid pro quo harassment claim, namely: (1) employee was a member of a protected class, i.e., the employee is a man or a woman; (2) employee was subject to unwelcome sexual harassment, i.e., sexual advances, request of sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome; (3) harassment was based upon sex, i.e., but for the fact of her sex, the plaintiff would not have been the object of harassment; and (4) harassment affected a term, condition, or privilege of employment. See generally Highlander v. K.F.C. National Management Co., 805 F.2d 644 (6th Cir. 1986); Nichols v. Frank, 42 F.3d 503 (9th Cir.1994).
In Highlander, 805 F.2d at 648-649, the United States Sixth Circuit Court of Appeals succinctly explained how quid pro quo harassment affects a term, condition, or privilege of employment and how quid pro quo harassment differs from hostile environment harassment:

Quid pro quo sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. In [a] quid pro quo harassment action, the employee bears the burden of proof to support charges that submission to the unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employer's [sic] failure to submit to the sexual demands of the supervisory employees.
* * * * * *
[U]nlike quid pro quo sexual harassment claims which may be predicated upon a *1364 single incident of sexual harassment, hostile environment claims are characterized by varied combinations and frequencies of hostile sexual exposures. [Citations omitted].
In analyzing this issue, we note that there is a split in the federal jurisprudence as to whether a plaintiff has to prove that the employer knew or should have known of the harassment and failed to take proper remedial action. Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311 (11th Cir.1989) (Corporate defendant is strictly liable for supervisor's harassment because when a supervisor requires sexual favors as quid pro quo for job benefits, the supervisor, by definition, acts as the company); Nichols, 42 F.3d 503 (Once quid pro quo sexual harassment has been established by the employee, the harasser's employer is, ipso facto, liable). Cf. Jones v. Flagship International, 793 F.2d 714 (5th Cir.1986) (In order for an employee to establish a quid pro quo sexual harassment claim, the employee must prove respondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action); Tomkins v. Public Service Electric & Gas Co., 568 F.2d 1044 (3d Cir.1977) (Title VII is violated when a supervisor, with the actual or constructive knowledge of the employer, makes sexual advances toward an employee and conditions that employee's job status evaluation, promotion, continued employment, or other aspects of career developmenton a favorable response to those advances, and the employer does not take prompt and appropriate remedial action after acquiring such knowledge). Additionally, we note that in the recent case of Sims v. Brown & Root Industrial Services, Inc., 889 F.Supp. 920 (W.D.La.1995), in which the plaintiff advanced claims under Title VII and La.R.S. 51:2231, the United States District Court for the Western District of Louisiana, citing Jones, 793 F.2d 714, held that in a quid pro quo sexual harassment claim a plaintiff must prove that the employer knew, or should have known, of the harassment in question and failed to take prompt remedial action.
However, Louisiana courts have not yet answered the issue of whether, under La. R.S. 23:1006, knowledge or imputed knowledge and failure to take remedial action by the corporate defendant is an essential element in a quid pro quo claim.
It is apparent from the record that Mary's claim, although she alleges both theories, is chiefly based upon quid pro quo harassment. Further, as previously stated, the jury found that (1) Mary was a member of a protected class; (2) Mary was subject to unwelcome sexual harassment; and (3) the harassment was based upon sex. However, the jury found that Kerlegon's harassment did not affect a term, condition, or privilege of Mary's employment. These are factual findings that may not be disturbed by an appellate court in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840 (La. 1989); Alphonse, 643 So.2d 836. After a thorough review of the relevant facts, we find that the jury was clearly wrong in failing to find that the harassment Mary suffered did not affect a term, condition, or privilege of her employment with Universal Life.
Mary testified that when she began to work at Universal Life, she enjoyed a good business relationship with Kerlegon. However, when Mary was asked if things began to change at work, the following colloquy took place:
Q. I guess we all think about winning the lottery and retiring sometimes, but did you look forward to going to work each day?
A. Yes, I did.
Q. Mary, did there come a time when that changed?
A. Yes.
Q. What happened?
A. Mr. Kerlegon started harassing me.
Q. All right. What do you mean he starting harassing you?
A. Threatening my job.
Q. How did he threaten your job?
A. If I didn't go to bed with him, I would lose my job.
* * * * * *
Q. Okay. Well, what did you tell him?
A. I asked him to stop.

*1365 Q. What did you dodid you do anything to start this?
A. No, I did not.
Q. Were you surprised when it started?
A. Yes, I was surprised.
Q. How did you feel when it started, Mary?
A. I felt hurt. I felt angry.
* * * * * *
Q. What did you do about it?
A. I begged him to stop.
Q. Did it stop?
A. It didn't stop.
Q. Who were you angry at right then? When that first started, who were you angry at?
A. I was angry at Kerlegon.
Q. Why were you angry at him?
A. Because of what he was doing, because of what he was putting me through.
Q. When you told him to stop, did it stop?
A. No, it did not.
Q. You said something about your job, the status of your job. I don't want to put words in your mouth. What, if anything, was said about your job status by
Mr. Kerlegon?
A. He told me if I didn't go along with it I would lose my job.
Q. What did he tell youdid he tell you anything about what would happen if you did go along with him?
A. What he told me was he had money, had power, he was moving up in the world, the company was making some changes, and he was going to be moving up. He wanted me to move up with him, but the only way I could do that was if I'd become his girlfriend and go to bed with him.
Q. And if you refused?
A. And if I refused I'd be on the outside of the door looking in because he was going to hire another secretary, and that was going to be part ofpart of her her job, I guess, her job duties was to be hishis girlfriend.
Q. Did he ever tell you why he wanted his secretary to include in her job being his girlfriend?
A. He told me that that was what the world was about, men have secretaries, they were going to be with them, and the women were going along with it because they had to work.
Q. Did you believe that, that it was that way everywhere?
A. No, I didn't believe it.
Q. Did you tell him that?
A. Yes, I told him that.
Q. What did he tell you.
A. He didn't care. That's what he wanted, and that was that. Either I go along with it, or I'd be out of the door.
Q. Did you tell him to stop one time?
A. I begged him to stop.
Q. Was it just one time?
A. I begged him to stop day after day, time after time, `Please stop.'
Mary then testified that Kerlegon warned her that if she notified Universal Life of his propositions, the "environment" would get hostile. In fact, Mary stated that after Kerlegon found out that she had reported him for harassment, he did not speak with her and would "throw" work on her desk and walk out. Finally, Mary testified that she continued work at Universal Life until July 29, 1988, when she was admitted to Charter Hospital because of her emotional anguish resulting from Kerlegon's harassment.
Mary's testimony regarding Kerlegon's propositions are corroborated by six tapes of their conversations that she recorded while at work. These six tapes were introduced into evidence at trial. Five of the tapes were dated as follows: August 17, 27, 28 and 31, 1987 and September 21, 1987. One of her tapes is not labeled with a written date; however, on the tape itself, Mary identified the tape with her name and the date of August 21, 1987. During trial, the jury heard the entirety of the tape dated August 17, 1987. These tapes substantiate that Kerlegon made repeated demands to Mary for sex in return for Mary receiving a promotion or a raise. But, Mary consistently refused his demands and requested that he cease *1366 making them. The tapes also reveal that Kerlegon informed Mary that things would be "difficult" between them if she refused to consent to a sexual relationship.
Kerlegon acknowledged that he asked Mary for a sexual relationship and that she never consented to such a relationship. He also admitted that he had fallen in love with Mary since she had begun working at the Lake Charles office. Kerlegon stated that after he received the written warning from Universal Life, he stopped engaging in these conversations with Mary. Regarding his conversations with Mary at work, Kerlegon stated:
Well, she would say, uh, you knowwhat I'm trying to say to you, Mary Craven and I said things in the office between the two of us that should never had been said.
We find that it is clear from the foregoing that Mary suffered quid pro quo sexual harassment at work. Kerlegon made repeated offers to Mary that in order for her to get a promotion or a raise, she would have to engage in a sexual relationship with him. The record substantiates that Mary persistently refused this offer. We note that Kerlegon's proposition was not a one-time conversation, he repeatedly demanded that Mary agree to sex in exchange for a promotion or a raise, and threatened her job, or at the very least, that her job would be difficult if she refused. Therefore, we conclude that the jury was clearly wrong in finding that the harassment Mary suffered did not affect a "term, condition, or privilege of employment."
We next turn to the question of whether the employer knew or should have known of the harassment and failed to take proper remedial actions. In this regard, we do not decide, either way, whether La.R.S. 23:1006 requires this element in a quid pro quo harassment claim because the facts in this case clearly demonstrate that Universal Life was advised of Kerlegon's harassment and failed to take adequate remedial actions.
Mary's attorney notified G.T. Howell, the vice-president of Universal Life, by a letter dated September 30, 1987 that Kerlegon was harassing Mary at work. Howell then turned this complaint over to Willie Irons, Universal Life's regional director for the Louisiana area, to investigate. As such, Irons met with Mary's attorney and listened to one of the tapes. Irons determined that Kerlegon was making "inappropriate" comments to Mary. At that point, Irons recommended that Kerlegon receive a written warning and be put on six month probation. In a "Probation Memorandum" dated November 9, 1987, Kerlegon received the following written warning:
There is to be no verbal or physical interaction that might be conceived as sexual or vulgar in nature. You Charles Kerlegon must conduct yourself in a strict professional manner. You must not take any punitive action what so ever [sic] against Mrs. Craven.
Despite the grossly inappropriate behavior of Kerlegon, Irons admitted that Kerlegon received the least severe punishment for his conduct toward Mary. Irons noted that Universal Life has three types of disciplinary action it can take, from the most severe to least severe, as follows: (1) immediate termination; (2) suspension without pay; and (3) probation. Irons also admitted that it was not "practical" for Universal Life to terminate or suspend Kerlegon because Universal Life would not have a district manager for Alexandria, Lafayette and Lake Charles. Further, Irons acknowledged that he was "not knowledgeable enough to know exactly what constitutes sexual harassment."
We conclude that Universal Life did not take proper remedial actions after it had knowledge of the harassment that Mary suffered. The record reveals that Kerlegon's statements were egregious and recurring. However, Kerlegon received the least severe rebuke for these actions. The inadequacy of Universal Life's action is further established by its "Personnel Policy and Practice Manual" that was introduced into evidence. A review of this manual demonstrates that Kerlegon received the same corrective measures as would an employee who (1) failed to maintain performance standards; (2) failed to follow specified job instructions; and (3) had an unexcused absence. The manual also indicates that Kerlegon received the same treatment *1367 as an employee who had a second violation of pacing or wasting time at work, creating unsanitary conditions at work, eating at the work station, and arriving late to work. Comparatively, these are inconsequential transgressions. The most similar violation to the one in the case sub judice contained in the manual would be "threatening or intimidating" other employees. For this, the manual dictates that for the first violation, that employee would be terminated.
Most importantly, Universal Life failed to take any type of remedial action to resolve Mary's concerns and any adverse effects that had already accrued. Although Universal Life wrote Kerlegon a letter and nominally placed him on probation, it left the working arrangement between Kerlegon and Mary otherwise undisturbed. While we see in the record limited testimony that Universal Life did place another employee named Tommy Currie, the sales manager, as Mary's new immediate supervisor, the record clearly demonstrates that Kerlegon was Currie's supervisor and that Kerlegon was still the supervisor of the office where Mary worked. Universal Life left Kerlegon in the district sales manager position, and as such, the lines authority remained the same. Universal Life simply interposed another level of supervision between Mary and Kerlegon.[2] Further, Mary testified that she continued to have problems even after Currie was named as her supervisor. Mary's problem in this case was that Kerlegon conditioned her job status and pay on a favorable response to his sexual demands. Despite this fact, Universal Life did not take any action reasonably contemplated to sever Kerlegon from the company's evaluation of whether Mary was entitled to a promotion or a raise.
Additionally, after reviewing Universal Life's policy manual, we find that it is largely punitive, rather than remedial. The key question of appropriate remediation is whether the action addresses the victim's situation, rather than whether the person or persons who engaged in the unlawful behavior are punished. A corporate action may certainly be both punitive and remedial, but the manual's provisions do little to satisfy the requirements of Universal Life's stated policy that it will "do what can be done to make up for any loss that the aggrieved employee may have suffered in job title, pay, or other terms or conditions of employment." In any event, we believe that this question of adequate remediation is a specific factual inquiry which must be determined on a case by case basis. And, we conclude that, under the particular facts and circumstances of this case, Universal Life's response was insufficient and did not appropriately address Mary's situation.

DAMAGES
Since the jury erroneously found that the harassment Mary suffered did not affect a term, condition, or benefit of her employment, the jury never reached the issue of damages. Where a fact finder does not reach an issue because of an "earlier" finding which disposes of the case, the appellate court, in reversing the earlier finding, must make a de novo determination of the undecided issues from the facts in the record. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); Austin v. Fibrebond Corp., 25,565 (La.App. 2 Cir. 2/23/94), 638 So.2d 1110, writ denied, 94-1326 (La. 9/2/94), 643 So.2d 149. Thus, we have conducted a de novo review of the record to ascertain whether Mary is entitiled to damages.

GENERAL DAMAGES
In her original petition, Mary requested general and special damages, and reasonable attorney's fees. Damages refer to pecuniary compensation, recompense, or satisfaction for injury or loss sustained by reason of violation of an obligation or owed *1368 duty. Damages are intended to restore the plaintiff, as closely as possible, to the position she would have occupied if the breach of duty had never occurred. LeBlanc v. Mercedes-Benz of North America, 93-907 (La.App. 3 Cir. 3/2/94), 633 So.2d 399. "General damages" are those which cannot be fixed with pecuniary exactitude; they involve mental or physical pain or suffering, inconvenience, loss of intellectual gratification, or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Montgomery v. Opelousas General Hospital, 546 So.2d 621 (La.App. 3 Cir.), writ denied, 551 So.2d 630 (La.1989). When there is a legal right to recover damages, but the amount cannot be exactly estimated, the court has reasonable discretion to assess damages based upon all of the facts and circumstances of the particular case. Moore v. Thornwell Warehouse Association, 524 So.2d 828 (La.App. 3 Cir. 1988).
In the present case, Mary unequivocally testified that when Kerlegon began to harass her at work, she felt hurt, angry, and shocked. She further stated that, as a result of Kerlegon's improper statements, she went home "just about every night crying." She noted that she began to see Dr. Giles R. Morin, a psychiatrist, in November 1987 because she was "having a hard time" and that she was "stressed out." Finally, she revealed that the main reason she was depressed was because of the atmosphere at work.
Bernice Auzenne, Mary's mother, testified that she had a close relationship with her daughter. In discussing Mary's reaction to Kerlegon's harassment, Bernice testified, in part, that:
Q. Okay. When Mary started to working at Universal Life originally, did she ever talk to you about her job?
A. She likeded (sic) her job when she first started.
* * * * * *
Q. All right. Did there come a time when Mary told you that she had a problem at work at Universal Life?
A. Yes, she did.
Q. What kind of problem did you understand she was having?
A. Sexual harassment.
Q. Did Mary call you and ask you for advice?
A. She calledI would say she called crying and said that, `Mama, Mr. Kerlegon is making passes at me,' and she said, `I think he means it. What can I do, Mama?' I said, "Well, Baby,' I say, `Tell him off,' and I say, "Try to make him stop.' Well, the next time I talk with her she say she did try to make him stop, he wouldn't stop; he kept after her.
Q. During this time period, Ms. Auzenne, how oftenand I know you're estimating, and I know we're talking about a long time ago, but how often do you think you and Mary would talk; can you estimate for us?
A. When it got real bad, Mary would call me several times a day.
Q. What was
A. Crying.
Q. her condition when she would call you?
A. She was hysterical. She was crying. I had tosometime had to stop her from crying in order tofor her to talk.
* * * * * *
Q. What was going on? What was her condition like, what was happening after she told the company about what was happening to her, what Mr. Kerlegon was doing to her at work?
A. Well, she was hurt because she didn't get no results from the company. You know, they wouldn't call her and say what was going on or what she could explain to them what was going on. I don't think she heard from them. They just ignored it.
Q. During this time period, how often did you and Mary continue to talk?
A. Very frequently.
Q. Did you become aware at some point that Mary was in the hospital?
A. Yes, I did.
Q. Why was she in the hospital?

*1369 A. She was in the hospital because she was a nerv ...had a nervous breakdown, and she was just to the end. She couldn't go anymore. She couldn't take it anymore.
Dr. Morin testified that he first examined Mary on November 6, 1987 and that her main problem at that time was that she was very agitated and she had trouble resting. Dr. Morin stated that she was depressed and agitated because of Kerlegon's harassment and the fact that she could not "get away from it." Dr. Morin diagnosed Mary as suffering from a "depressive reaction." In explaining his diagnosis, Dr. Morin pointed out:
Well, she felt that she was caught in a situation that she couldn't escape. She had no choice in the matter. She had to work and as a result of that she started losing sleep, she couldn't sleep at night. She found herself very irritable in dealing with her child. It was affecting her relationship at home.
After his examination, Dr. Morin recommended that Mary continue taking Limbritol, which is a combination of a tranquilizer and an antidepressant.
Dr. Morin testified that he began to see Mary about once a month. He noted that he saw "very little improvement" and that she continued to be "extremely agitated" because the situation at work was very difficult. Dr. Morin succinctly pointed out the effect of Kerlegon's harassment on Mary:
Well, again, it's a matter of choice. She had no choice, she had to go to work. And he wouldn't stop and he kept insisting that they have an affair, and she kept saying no, that she was not interested. All she wanted to do was do her work, her secretarial work, so there was the frustration of nothing changing, the fear, of course, of losing her work or her job as a result of this.
Dr. Morin stated that in the spring of 1988, Mary was "so distraught" that he prescribed Xanax, a tranquilizing medication. However, Dr. Morin testified that when this medicine did not help Mary, he suggested that she be admitted to Charter Hospital on July 29, 1988.
Dr. Morin noted that Mary was a patient at Charter Hospital until August 15, 1988, when she was discharged. He stated that while Mary was hospitalized, he saw her on a daily basis and that she also saw a psychologist and social worker to help her with her "tremendous anger" toward Kerlegon. While Mary was at Charter Hospital, Dr. Morin prescribed Elavil at bedtime and Xanax four times a day. The medical records from Charter Hospital which were introduced into evidence reveal that Mary had a "[d]epressive reaction, major episode." Further, Dr. Morin unequivocally testified that the medical treatment he provided, including the hospitalization, was directly attributable to the harassment that Mary endured at work. After Mary was discharged from Charter Hospital, he noted that she continued to feel "very inadequate" and that she had "no self-esteem." Finally, Dr. Morin stated that he released Mary to work on October 31, 1989.
Universal Life's psychologist, Dr. Lawrence Dilks, saw Mary on August 2 and 3, 1988 for a "psychological evaluation." After his examination, Dr. Dilks opined that Mary suffered from "major depression"; however, he could not determine its cause. Also, Dr. Dilks stated that, from the results of the various tests, he felt that Mary was telling the truth about Kerlegon. But, he noted that Mary did not show any signs of post-traumatic stress disorder. When Dr. Dilks was discussing the concept of post-traumatic stress disorder, the following colloquy took place:
Q. But we know from what you've told us that the studies that tell us what to look for for posttraumatic [sic] stress disorder don't really include specific studies about lots of people who have been through sexual harassment because the studies haven't been done?
A. That's true.
Q. So there must be an assumption that the profile of an individual who goes through a car wreck and has posttraumatic [sic] stress disorder or the individual who goes to Vietnam and is subjected to terrible stress and comes back with posttraumatic stress disorder will *1370 be similar to the individual who suffers sexual harassment; is that correct?
A. That's correct.
In fact, Dr. Dilks admitted that he would have had a better foundation to opine about Mary's condition if he could have listened to the six tapes and interviewed Kerlegon. Finally, in his "psychological evaluation report," Dr. Dilks recommended that Mary (1) continue to be hospitalized at Charter Hospital; (2) continue medical and psychiatric consultation; (3) participate in individual and group counseling; (4) participate in biofeedback training for stress management; and (5) continue counseling after her discharge from Charter Hospital.
Universal Life asserts that Mary's depression was related to an extramarital affair that she was allegedly having during the time period that Kerlegon was harassing her at work. Mary admitted that she had an affair with Wilford D. Carter from 1982-1985. Mary also acknowledged that she and her husband had marital problems; however, she testified that by 1987, her marriage was "good." Wilford D. Carter, on the other hand, testified that he and Mary continued to have an affair until 1988. After reviewing the record, we do not conclude that her affair was in any way causally connected to Kerlegon's repeated harassment at work nor that her affair was a substantial factor in her depression. Dr. Morin opined that Mary's depression and hospitalization were directly related to Kerlegon's egregious behavior. Dr. Dilks, on the other hand, opined that Mary's affair was one of the factors that caused her depression. As a general rule, we note that the diagnosis of a plaintiff's treating physician is entitled to more weight than that of a defendant's physician who examines the plaintiff once for diagnostic purposes in preparation for litigation. Arabie v. City of Eunice, 629 So.2d 465 (La.App. 3 Cir.1993); Lougon v. Era Aviation, Inc., 609 So.2d 330 (La.App. 3 Cir.1992); DeGruy v. Pala, Inc., 525 So.2d 1124 (La. App. 1 Cir.), writ denied, 530 So.2d 568 (La.1988). Further, we find that there is ample evidence in the record that supports Mary's contention that her depression was caused by Kerlegon's repeated demands for a sexual relationship in exchange for a promotion or pay raise, which she continuously and firmly rejected. Thus, we conclude that Universal Life's argument is without merit.
In assessing the nature and severity of Mary's emotional anguish, we have considered that she suffered a violation of a right to individual dignity that is protected by the legislative enactment of La.R.S. 23:1006, which prohibits discrimination by an employer on the basis of sex. And we note that, as the United States Ninth Circuit Court of Appeals stated in Nichols, 42 F.3d at 510:
The most oppressive and invidious type of workplace sexual harassment is quid pro quo sex. There can be no justification for requiring a worker to engage in sexual acts in order to obtain a job or job-related benefit, or to avoid a job-related detriment. Most workers subjected to sexual pressure in the workplace have little means of defenseother than the law. For economic reasons, most workers cannot simply abandon their employment new jobs are hard to find.
After considering the evidence presented in this case, we award Mary the sum of $100,000.00 in general damages.

MEDICAL EXPENSES
Mary may recover reasonable medical expenses which she has incurred as a result of her depression, but she must prove the existence of her mental damages and a causal connection between that and Kerlegon's harassment. The test is whether the plaintiff has shown through medical testimony that, more probably than not, subsequent medical treatment was necessitated by the mental anguish that she suffered as a result of Kerlegon's harassment. See White v. Longanecker, 93-1122 (La.App. 1 Cir. 5/23/94), 637 So.2d 1213, writ denied, 94-1704 (La. 10/7/94), 644 So.2d 640. When a plaintiff alleges that she has incurred medical expenses and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of that item in the judgment. Rowsey v. Jones, 26,823 (La.App. 2 Cir. 5/10/95), 655 So.2d 560; Landry v. City of Abbeville, 625 So.2d 655 (La.App. 3 Cir. *1371 1993), writ denied, 93-2820 (La. 1/28/94), 630 So.2d 789; Brightman v. Regional Transit Authority, 543 So.2d 568 (La.App. 4 Cir. 1989).
As previously stated, Mary has proven by a preponderance of the evidence that (1) her mental anguish was caused by Kerlegon's repeated harassment at work and (2) Dr. Morin's medical treatment, including the hospitalization, was directly related to Kerelgon's continued harassment. Further, Mary introduced the following medical bills into evidence: Charter Hospital$8,548.25; Diagnostic Radiology Associates$110.00; and Dr. Morin$1,926.00. Therefore, we award Mary $10,584.25 in past medical expenses.

PAST LOST INCOME
In order to recover for actual wage loss, a plaintiff must prove past lost earnings and the length of time missed from work due to the tort. ANMAC Foundation v. St. Patrick Hospital, 594 So.2d 951 (La.App. 3 Cir. 1992). Past lost earnings are susceptible of mathematical calculation from proof offered at trial and requires such proof as reasonably establishes the claim. This may consist of the plaintiff's own testimony. McDonough v. Royal Sonesta, Inc., 626 So.2d 438 (La.App. 4 Cir.1993); Simar v. NOWCAM Services, 617 So.2d 164 (La.App. 3 Cir.1993).
In the case sub judice, Mary unequivocally testified that she worked forty hours a week at Universal Life earning about seven dollars per hour. Therefore, Mary was earning approximately $280.00 per week. She also stated that she continued to work until July 29, 1988, when she was admitted to Charter Hospital. Further, Dr. Morin noted that he did not release Mary back to work until October 31, 1989. Mary stated that she did not work during this time period because of the effects of the sexual harassment. However, Mary did admit that she found gainful employment after Dr. Morin released her back to work. Therefore, the record substantiates that Mary was unemployed for approximately 65 weeks due to circumstances caused by Kerlegon's harassment. Thus, we award Mary $18,200.00 in past lost wages.

ATTORNEY'S FEES
A plaintiff who establishes a cause of action against an employer for sexual discrimination may recover reasonable attorney's fees. La.R.S. 23:1006 D. In considering reasonable attorney's fees, several factors are relevant in the inquiry, namely: (1) the ultimate result obtained; (2) the amount of money involved; (3) the extent and character of the work performed; (4) the legal knowledge, attainment and skill of the attorney; and (5) the number of appearances made. Alphonse, 643 So.2d 836; State, Department of Transportation & Development v. Jacob, 491 So.2d 138 (La.App. 3 Cir.), writ denied, 496 So.2d 331 (La.1986).
In the present case, counsel[3] for Mary filed the petition initiating this suit; participated in a hearing on a peremptory exception of no cause of action; defended a motion to compel discovery filed by Universal Life; successfully defended a motion for summary judgment filed by Universal Life; participated in the deposition of Dr. Morin; prepared for trial on the merits; participated in a four-day jury trial with ten witnesses and several exhibits; prepared special jury interrogatories; filed a motion for a new trial or judgment notwithstanding the verdict after the jury decision; and prepared an appellate brief and argued the appeal. Additionally, Mary's counsel was successful in reversing the jury's decision on appeal, thus, entitling Mary to receive damage awards. Further, we note that this case concerned an area of law that has not been litigated often in our jurisprudence and presented novel issues for our consideration. Finally, Mary's attorneys have taken the responsibility of representing her for approximately eight years during the course of this litigation. Therefore, we award Mary attorney's fees in the amount of $10,000.00.
As a final matter, we observe that in Mary's original petition, she alleged medical expenses of only $10,000.00 and did not specifically *1372 plead past lost wages as an element of her damages. However, we have considered these claims and have awarded past lost wages and medical expenses in excess of $10,000.00 because evidence of past lost wages and medical expenses in excess of $10,000.00 were introduced into evidence without objection from Universal Life. Therefore, we find that Universal Life implicitly consented to an enlargement of Mary's petition to include the award for past lost wages and medical expenses of $10,584.25. See Roy v. Gupta, 606 So.2d 940 (La.App. 3 Cir.), writ denied, 609 So.2d 232 (La.1992); ANMAC Foundation, 594 So.2d 951.

DECREE
The jury's findings that Mary was subjected to unwelcome sexual harassment while employed at Universal Life remain undisturbed since they were not on appeal in this case. However, we reverse the jury's finding that Kerlegon's harassment did not affect a term, condition, or privilege of Mary's employment and award general and special damages and attorney's fees. Accordingly, we recast the judgment as follows:
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that there be judgment in favor MARY J. CRAVEN and against UNIVERSAL LIFE INSURANCE COMPANY.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein for general damages in favor of MARY J. CRAVEN and against UNIVERSAL LIFE INSURANCE COMPANY in the sum of ONE HUNDRED THOUSAND ($100,000.00) DOLLARS, together with legal interest from date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein for past medical expenses in favor of MARY J. CRAVEN and against UNIVERSAL LIFE INSURANCE COMPANY in the sum of TEN THOUSAND FIVE HUNDRED EIGHT-FOUR AND 25/100 ($10,584.25) DOLLARS, together with legal interest from date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein for past lost earnings in favor of MARY J. CRAVEN and against UNIVERSAL LIFE INSURANCE COMPANY in the sum of EIGHTEEN THOUSAND TWO HUNDRED ($18,200.00) DOLLARS, together with legal interest from date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein for attorney's fees in favor of MARY J. CRAVEN and against UNIVERSAL LIFE INSURANCE COMPANY in the sum of TEN THOUSAND ($10,000.00) DOLLARS, together with legal interest from the date of this opinion, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the expert witness fee of Dr. Morin, in the sum of $250.00, be taxed as court costs.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of trial and this appeal are assessed against UNIVERSAL LIFE INSURANCE COMPANY.
REVERSED AND RENDERED.
NOTES
[1] Universal Life's "Policy Regarding Sexual Harassment" stated:

UNIVERSAL LIFE INSURANCE COMPANY will neither condone nor tolerate any form of sexual harassment in any of its workplaces or work environments. We define "sexual harassment" as a form of sex discrimination that includes, but is not limited to, the following: unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature made to an employee when submission to such demands or conduct is made either explicitly or implicitly a term or condition of an individual's employment; submission to or rejection of such conduct by an individual employee is used as the basis for employment decisions; such conduct has the purpose or effect of substantially interfering with an individual's work performance; or such conduct has the effect of creating an intimidating, hostile, or offensive working environment.
Complaint Procedure
Any employee who has or believes that he or she has grounds or reason to make a complaint of harassment, as specifically defined above, may do so either in person or in writing. Such complaint or complaints may be taken to the immediate supervisor, or to the officer in charge of the department, or to the Human Resources officer. To the extent possible and consistent with ascertaining the facts, all complaints will be handled confidentially.
Complaints must be reported when, based on observation or discoveries, a supervisor or manager has evidence or reason to suspect that instances of sexual harassment have or may be taking place against an employee or other person on his/her staff.
Once a complaint has been reported, the next step will be to set up a verification process designed to discover and evaluate evidence.
If the complaint is found to be justified, appropriate action will be taken to repudiate the harassment, make sure that it ceases, and then do what can be done to make up for any loss that the aggrieved employee may have suffered in job title, pay, or other terms or conditions of employment; as well as assess appropriate penalty to the offender such as disciplinary warning, suspension, demotion, or discharge.
If the complaint is found not to be justified, the complainant has the right to appeal the decision to the Secretary's office.
[2] The job description for the district sales manager, which was introduced into evidence at trial, stated in part:

This person will plan and supervise the recruitment selection and training of all persons entering the district operation as life underwriters, staff managers and special agents.
Then after the above responsibilities have been fulfilled, the manager administers and supervises all activities of all personnel on [sic] the district.
Further, Kerlegon unequivocally testified that the district sales manager was the supervisor of a sales manager.
[3] The record establishes that Mary was represented by three different attorneys during the course of this litigation.