733 So.2d 91 (1999)
William M. ODOM, Sr., et ux., Plaintiff-Appellee,
v.
STATE of Louisiana, Through the DEPARTMENT OF HEALTH AND HOSPITALS, et al., Defendants-Appellants.
No. 98-1590.
Court of Appeal of Louisiana, Third Circuit.
March 24, 1999.
*92 George Arthur Flournoy, Alexandria, for William M. Odum, et ux.
Victoria Reed Murry, Baton Rouge, for State of Louisiana, et al.
BEFORE: YELVERTON, WOODARD, and GREMILLION, Judges.
WOODARD, Judge.
In this malpractice suit, arising from the death of Joseph Paul Odom (Jojo), his adoptive parents, Mr. William M. Odom *93 and Mrs. Ramona R. Odom, named as defendants the Pinecrest Developmental Center through the State of Louisiana, the Department of Health and Hospitals (Pinecrest). At the close of a hearing held May 5-8, 1998, the Odoms filed a motion for directed verdict on the issue of Pinecrest's liability. The trial court granted the Odoms' motion and submitted the issue of quantum of damages to the jury. The jury returned a verdict in which it awarded Ms. Odom $86,000.00 and Mr. Odom $8,000.00 in general damages. The jury also awarded the Odoms $75,000.00 for Jojo's predeath fright and pain, $3,394.00 in funeral and burial expenses, and $1,215.00 in medical expenses. The $1,215.00 in medical expenses were increased to $1,992.34 by the trial court upon submission of evidence, showing that this was the amount of medical expenses actually incurred, in a motion for partial new trial filed by the Odoms. Pinecrest appeals suspensively.

FACTS
Jojo was born twelve weeks, prematurely, on June 14, 1979 at the Huey P. Long Medical Center in Pineville, Louisiana, weighing 1.6 pounds. His sixteen-year-old mother immediately placed him for adoption. Jojo remained in a premature nursery until September 20, 1979 and was placed into two different foster homes prior to his admission at Pinecrest on January 27, 1984. While a Pinecrest resident, Mr. Odom and Mrs. Odom adopted him on January 29, 1993. Jojo died of hypoxia[1] at Pinecrest on August 19, 1994. At birth, he was diagnosed with hyaline membrane syndrome, and he had his first seizure when he was six weeks old. In a Pinecrest interdisciplinary team annual report, dated November 9, 1993, his condition was described as follows:
Joseph is fourteen years of age. He is a non-verbal and non-ambulatory white male. Joseph is spastic quadraplegic (sic), hydrocephalic, has asthma, a convulsive disorder, and respiratory distress.
. . . .
... Since admission he has been tested to determine his level of intellectual functioning and reached an IQ of 4 and a mental age of 2 months.
. . . .
Joseph functions both intellectually and adaptively in the profound (-IV) range of mental retardation. Joseph responds to his name. He does not appear to be tactile defensive.... Joseph recognizes familiar people. He requires assistance with all self-help skills. Joseph demonstrates disabilities in vision.
Additionally, Jojo was unable to feed himself and was nourished via gastrostomy tube since 1981. Because he suffered from obstructive apnea due to a malformation of his head, neck, and trachea, his breathing became dependant on a trach tube. First and following an episode of respiratory distress, he sustained a tracheostomy at St. Frances Cabrini Hospital (Cabrini) on June 24, 1992. Subsequent to an episode of extubation on July 2, 1992, he was transported from Cabrini to the Children's Hospital where a new trach tube was installed.
Simultaneous to his discharge from the Children's Hospital on August 19, 1992, Dr. Dawn M. Baroni issued a home care plan regarding his tracheostomy. Among other things, the plan specified that the trach collar or trach ties should be changed once daily, the trach itself should be changed at least every Wednesday, and that a spare trach should always be kept at Jojo's bedside. The plan also required that an apnea monitor be maintained on Jojo "while sleeping or unattended." The Children's Hospital recommended that the apnea monitor be set to alarm within the following parameters:

*94
Apnea 15 seconds (The maximum amount of time lapse between
 each breath)
Bradycardia (low heart rate) 50 (Minimum amount of heart beats per
 minute)
Tachycardia (high heart rate) 150 (Maximum amount of heart beats per
 minute)

Finally, the plan recommended that Pinecrest keep a log of information to include, among other things, "secretion type and changes," "Respiratory rate," and "pulse."
In fact, the apnea monitor was set to alarm when Jojo's heart rate decreased below sixty beats per minute or accelerated over one hundred thirty-two beats per minute and when respirations slowed to less than twelve per minute or increased above thirty-two per minute. Pinecrest also instituted a trach and apnea monitor chart to be filed by the nurses on a daily basis. The apnea monitor chart, in particular, was implemented to check whether the nurses kept the monitor turned on at all times. Indeed, testimony adduced showed that the monitor's alarm would go off frequently, sometimes for no reason, other times because Jojo would simply hold his breath so that the nurses would attend to him. The nurses would become "aggravated" with the alarm and would turn off the monitor. Finally, a daily activity schedule, implemented pursuant to Pinecrest doctors' orders, reflects that the apnea monitor was to be "on at all times."
The nurses at Pinecrest were required to keep Jojo under a very specific regimen. Regarding his evening schedule, Jojo was supposed to be fed around 8:00 p.m. in his wheelchair. Once in bed, he had to follow a bed positioning program ordered by orthopedists; namely, he had to remain, either, on his left or right side to facilitate his breathing, alternating positions every three hours. At no time, was he supposed to lay on his back or stomach.
Pinecrest is a large facility which is structured in homes, and Jojo was assigned to Pedi-I, 501(501). 501 was consistently staffed with two licensed practical nurses (LPN), one registered nurse (RN), and three to four resident training specialist (RTS) for each of the three eight-hour shifts to be filled during the day. The first shift would run from six a.m. until two p.m., the second from two p.m. until ten p.m., and the third from ten p.m. until six a.m.
During the two-ten shift on the afternoon of August 19, 1994, 501 was staffed with one R.N., Ms. Nancy Fowler,[2] one LPN, Ms. Dorothy Johnson, and three RTS, Ms. Jennifer Ogle, Mr. William Lambert, and Ms. Esther Means.[3] A Pinecrest schedule regarding the two to ten shift reveals that Ms. Ogle was originally assigned to Home 502 and Mr. Lambert to Home 504. The schedule also reveals that fifteen clients were assigned to 501.
Ms. Means checked Jojo around 5:30 p.m., and Ms. Fowler stated that she checked him around 6:00 p.m. It was about 6:20 p.m. when Ms. Means, while making a round, found Jojo with his trach out of the stoma[4] but still tightly attached to his neck. Immediately, she hollered at Ms. Johnson for help. Ms. Ogle and Ms Johnson responded rapidly. Ms. Johnson immediately sent Ms. Means to call Ms. Fowler for help and asked if anyone knew CPR. Ms. Ogle answered that she thought she did and started CPR through Jojo's *95 mouth, unaware that Jojo had a trach. She stated that Jojo was lying on his back when she arrived and that his skin color was blue. She was unable to feel a pulse or see him breathe. Ms. Johnson remembers Jojo to be lying on his side as she responded to Ms. Means' call. She stated that she tried to pull the trach back in but was unsuccessful. She asserts that she helped Ms. Ogle with CPR and recalls that Jojo's lips and nail beds had turned blue or cyanotic but does not remember seeing any spare trach on Jojo's bedside table, as it was required.
Ms. Addie Savoy, Ms. Doris Gjesdal, and an RN, Ms. Juanita Wiley, responded from other homes. Ms. Wiley immediately took the CPR efforts under her control. First, she noticed that Jojo was breathless and felt a faint "very, very, weak" and extremely thready pulse. She immediately reinserted the trach but with difficulty, because it was snugly tied around Jojo's neck. She noticed that Jojo was still hooked to a monitor. She started CPR, and upon noticing that Jojo pinked back up, she increased her resuscitation efforts.
Never, at any time, did anyone hear the heart monitor's alarm sound. Ms. Means asserts that the monitor was on, because she saw that the monitor's red lights, indicating the heart rate and breathing rate, were blinking. She stated that she took the monitor's leads off of Jojo to put the monitor out of the way, but the alarm did not sound.
CPR efforts continued while Jojo was placed on a stretcher and sent on his way to HPL. Ms. Wiley recalls seeing the monitor's leads still placed on Jojo. The ambulance did not arrive promptly, and the nurses had trouble keeping the stretcher from collapsing. Nevertheless, Ms. Wiley continued with her CPR efforts until they arrived at the HPL's emergency room. There, a doctor was apparently angry that they had brought him a dead child. Jojo was pronounced dead at HPL at 7:02 p.m.
The Odoms filed suit against Pinecrest. At the end of a jury trial, held from May 5-8, 1998, the Odoms filed a motion for directed verdict on the issue of liability, which the trial court granted. The jury awarded Ms. Odom $86,000.00 and Mr. Odom $8,000.00 in general damages; the Odoms, $75,000.00 for Jojo's pre-death fright and pain, $3,394.00 in funeral and burial expenses, and $1,215.00 in medical expenses. The $1,215.00 in medical expenses were increased to $1,992.34 by the trial court upon submission of evidence, showing that this was the amount of medical expenses actually incurred, in a motion for partial new trial filed by the Odoms. Pinecrest appeals suspensively.

ASSIGNMENTS OF ERROR
The state asserts that the trial court manifestly erred in (1) granting the Odoms' motion for directed verdict on the issue of liability; and (2) finding that the Odoms met the statutory burden of proof imposed on medical malpractice claimants by the provisions of La.R.S. 9:2794.
The Odoms answer the appeal asserting that the award of damages to them was in error. They assert that the lowest reasonable award for Mr. Odom should be $100,000.00 and the lowest reasonable award to Ms. Odom should be $150,000.00.

LAW

MOTION FOR DIRECTED VERDICT
The only issue raised by Pinecrest's assignments of error is whether the trial court erred in granting the Odoms' motion for directed verdict which indicates that they met their burden of proving negligence under the required statutory standards set forth by La.R.S. 9:2794.
Pursuant to La.Code Civ.P. art. 1810, this court in Campbell v. Mouton, 373 So.2d 237, 239 (La.App. 3 Cir.1979) articulated the standard for granting a directed verdict in a jury trial to be as follows:
"On motions for directed verdict ... the Court should consider all of the evidence not just that evidence which *96 supports the non-mover's case but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."
(Quoting Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969))(emphasis added). The standard set forth in Campbell has been consistently upheld in our circuit. See Cliburn v. Colonial Penn Ins. Co., 583 So.2d 103 (La.App. 3 Cir.1991); See also Carter v. Western Kraft Paper Mill, 94-524 (La. App. 3 Cir. 11/2/94); 649 So.2d 541.
Additionally, the trial court may not resolve questions of credibility in a directed verdict for such an issue lies upon the jury. Carter, 649 So.2d 541. While we review a trial court's grant of a motion for directed verdict, we must not ascertain whether the plaintiffs proved their case by a preponderance of the evidence but whether upon viewing the evidence submitted, we conclude that reasonable people could not have reached a verdict in favor of the nonmover. Id. When we determine the propriety of the trial court's decision, "[we] must analyze the evidence presented through the looking glass of substantive law." Bernard v. Ferrellgas, Inc., 96-621 (La.App. 3 Cir. 2/5/97); 689 So.2d 554, 557.

MALPRACTICE
In a medical malpractice action alleging the negligence of a hospital, the plaintiff carries the burden of proving, as in any negligence action, that "the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury." Smith v. State Through Dep't HHR., 523 So.2d 815, 819 (La.1988).
Furthermore, it is well settled that a hospital may also be liable for the negligent acts committed by its employees, including nurses, pursuant to the doctrine of respondeat superior. Lopez. v. State, 98-577 (La.App. 3 Cir. 10/28/98), 721 So.2d 518. In such a case, the liability imputed upon the hospital must be viewed in light of the nurses' actions. See id. Thus, a hospital may be liable for the negligence of a nurse if the nurse violated the legal standards of negligence applicable for nurses.
In Migues v. Sagrera, 620 So.2d 463, 465 (La.App. 3 Cir.1993), we stated that a nurse may be negligent, under the provisions of La.R.S. 40:1299.41(A) of the Louisiana Medical Malpractice Act, in the following circumstances:
Nurses and other health care providers are subject to the same standard as physicians. It is a nurse's duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case.
(Emphasis added).
More specifically, La.R.S. 9:2794 sets forth three requirements which a plaintiff must satisfy to meet its burden of proving the negligence of a nurse: (1) she must exercise the degree of skill ordinarily employed, under similar circumstances, by the members of the nursing or health care profession in good standing in the same community or locality; (2) she either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with her best judgment in the application *97 of that skill; and (3) as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not, otherwise, have occurred.
The distinction of whether a suit is brought on the basis of a hospital's own liability or that of a nurse under the doctrine of respondeat superior is relevant to the analysis that we must perform, because the law pertinent to the standard of negligence applicable to nurses is conditioned upon the locality rule; whereas, the general rules of negligence are applicable to determine whether a hospital was negligent. La.R.S. 40:1299.41(A)(7); See Smith, 523 So.2d 815.
In the case sub judice, the Odoms filed a petition against Pinecrest, alleging that Jojo's death was caused by the negligence and fault of Pinecrest, its servants, and employees. Specifically, they asserted the following wrongful acts or omissions:
A) Failure to instruct, train and supervise properly its employees in the management and care of resident patients/clients like decedent.
B) Failure to monitor,
C) Improper staffing,
D) Neglectful supervision,
E) Utilizing an improper tie device on the tracheotomy apparatus, and
F) Disconnecting and/or rendering inoperable or useless decedent's heart monitor.
Whereas §§ A through E relate to Pinecrest's own negligence, § F relates, in fact, to Pinecrest's liability asserted on the basis of the negligence committed by its nurses in improperly disconnecting or rendering inoperable Jojo's heart monitor. Although the trial court did not specifically state the ground upon which it relied to grant the Odoms' motion for directed verdict, the trial court's reasons for judgment are enlightening in that it states the following:
I think that anybody with a reasonable mind that would hear the evidence would be-would decide that there was a requirement that the monitor be on and that it was disconnected by the staff and that was the cause in fact of his injury. So I will grant a Directed Verdict as requested by the plaintiff on the issue of liability.
(Emphasis added). Thus, the trial court relied upon § F of the Odoms' petition to grant their motion for directed verdict. Accordingly, we review the trial court's decision in light of the statutory standards of negligence applicable for nurses to determine whether Pinecrest may be liable pursuant to the doctrine of respondeat superior. Finding that the Odoms met their burden of proving the nurses malpractice on a motion for directed verdict, we affirm the trial court's decision.

The Amount of Skill Required from the Nurses
In the case sub judice, the degree of skill that the nurses at Pinecrest were supposed to employ, viewed in light of the degree of skill ordinarily employed under similar circumstances by the members of the nursing profession in good standing in the same community or locality, required them, simply, to follow the order issued, either, by Dr. Baroni at the children hospital or Pinecrest's own doctors regarding the operation of the apnea monitor; namely, the nurses had to leave the monitor on at all times, in the least, when Jojo was left unattended and/or while he slept.
The trial court found that a Daily Activity Schedule prepared by Pinecrest's own doctors required that Jojo be placed on the heart monitor twenty-four hours a day. The trial court's finding on this issue is also predicated on the fact that all the RNs, LPNs, and RTSs were under the impression that the monitor was to be turned on continually. Additionally, the record reflects that the monitor followed Jojo everywhere, even school. Finally, we do not see any merit in Pinecrest's argument *98 that the monitor was only supposed to be on when Jojo was sleeping or unattended, because Jojo was, in fact, located in his bed and had not been attended to for at least twenty minutes preceding the discovery of the incident. Thus, even assuming that Pinecrest's argument is correct, the nurses still were under the duty to place Jojo on a heart monitor while he lay in bed unattended.
We find that the trial court's findings and conclusions are supported by the record.

Failure to Exercise the Required Skills
The trial court found that the nurses at Pinecrest failed in their duty to keep the monitor on and that reasonable minds could not reach a contrary verdict. Again, we agree. The evidence adduced at trial regarding this issue is overwhelming. It is undisputed that the nurses did not hear the monitor's alarm sound at all times pertinent to the events. Ms. Means testified that the monitor was on, because she saw the red lights blinking. She stated that the lights were still on after the failed resuscitation efforts, that she disconnected the cables from Jojo to move the monitor out of the way, and, yet, the alarm still did not sound. The other nurses are not sure whether the monitor was on. Ms. Johnson stated in her deposition that she did not check whether it was on, but she asserted that it was on during her testimony. Ms. Wiley contradicts Ms. Means' testimony that the monitor leads were off Jojo once he was placed on the stretcher.
Mr. David S. Rolka, electronic engineer at Corometrics, maker of the apnea monitor, testified that he tested the monitor actually used on Jojo after the accident and that it was functioning within the required parameters. Mr. Rolka testified that the apnea monitor's alarm should have sounded if the leads were pulled apart of the monitor, and the monitor was still on. Thus, his testimony eliminates any other possibilities except that the monitor was turned off or that it was on but not reset after the alarm sounded at some time during the day.
Relying on Dr. Kenneth Mauterer's testimony, Pinecrest argues that the monitor did not sound because it is set to detect chest wall movements and not apnea. Assuming arguendo that Pinecrest's assertion is correct, then, we do not see how the monitor did not detect Jojo's absence of pulse. Ms. Ogle testified that she noticed that Jojo was blue, that she could not find a pulse or see him breathe when she started her CPR efforts. Ms. Johnson, also stated that Jojo's lips and nail beds had turned blue or cyanotic. Ms. Wiley testified that once she took over the CPR efforts, she felt a weak and thready pulse for a short period of time, and the pulse stopped. Yet, although the monitor is still claimed to be on up to that point in time, the alarm never sounded.
Asked for his opinion on these facts, Dr. Mauterer stated that he had "no answer for that." Apparently, the trial court had an answer for him in its reasons for judgment, when it stated:
I believe that the evidence has shown that he was in such terrible shape when they found him that the monitor should have alarmed, and did not alarm, and I believe the reason for that was that it was disconnected. He was connected to it. It was just not turned on.
Furthermore, we agree with the trial court that the disappearance of the apnea monitor and trach care check lists is odd. The trial court found that it created an adverse presumption against Pinecrest, stating:
[T]hey historically had not kept the monitor on Joseph and it aggravated some of the people that were taking care of him so much that they started that check list to make sure that people would do that. And so they created this paper work to make sure that the monitor was on and then when he dies and there is a question whether or not *99 the monitor was on, the paperwork is not present.
(Emphasis added).
A post death report issued pursuant to an investigation conducted by Ms. Glori Strange, chief investigator for abuse and neglect at Pinecrest, also specified the following:
Evidence obtained during investigation indicates that the heart monitor was not engaged at the time the trach tube was observed to be pulled out. Subsequent testing of the heart/apnea monitor revealed that the heart/apnea monitor was operational and should have alarmed within seconds of the client's respiratory distress.
(Emphasis added). Another significant report, issued by the Office of Community Services report, filed by Ms. Lila Bamburg and Jerry Cearley, also concluded that the "apnea monitor itself was apparently not engaged or reset so that it could alarm."
We need not look any further to find that there was overwhelming evidence upon which the trial court relied to find that the monitor was turned off, in breach of the various doctors' orders with which the nurses should have complied.

Proximate Causation
Regarding the issue of proximate causation in a wrongful death action, "the plaintiff must prove `only that there would have been a chance of survival' and that the patient was denied this chance of survival because of the defendant's negligence." Smith, 523 So.2d 815, 820 (quoting Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 721 (La.1986)).
In the case sub judice, the trial court found that the fact that the alarm did not sound was the cause-in-fact of Jojo's death, specifically stating:
When he first had his respiratory problems, if it would have alarmed (sic) they could have gone over there and obviously have been in a lot better shape of giving him a chance of living.... But obviously, if they had known about it right after it happened, they would have been in a lot better shape as far as resuscitating him and giving him a chance to live.
We agree with the trial court's conclusion. Indeed, it is obvious that the monitor was supposed to be on Jojo to warn the nurses of any respiratory distress episodes that he may experience. On October 3, 1994, Dr. Brenda Reams issued a forensic pathologists report which specified the cause of Jojo's death to be "[h]ypoxia, secondary to respiratory insufficiency, secondary to apnea episodes...." Thus, Jojo's cause of death is directly related to the absence of being placed under the watch of a heart monitor.

GENERAL DAMAGES
The Odoms claim that the jury award of $8,000.00 to Mr. Odom and $86,000.00 to Ms. Odom was so low as to shock the conscience. The Odoms request that Mr. Odom's award be increased to $100,000.00 and Ms. Odoms' to $150,000.00.
It is well settled that "`[g]eneral damages' are those which cannot be fixed with pecuniary exactitude; they involve mental or physical pain and suffering, inconvenience, loss of intellectual gratification, or other losses of life or lifestyle which cannot be definitely measured in monetary terms." Craven v. Universal Life Ins. Co., 95-1168 (La.App. 3 Cir. 3/6/96); 670 So.2d 1358, 1368, writ denied, 96-1332 (La.9/27/96); 679 So.2d 1355; Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978).
Furthermore, the finder of fact is given "much discretion" in awarding general damages. See Reck v. Stevens, 373 So.2d 498 (La.1979). We may only reverse a trial court's award of general damages upon finding that the trial court abused its discretion. In its landmark case pertinent to this issue, the supreme court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993); cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 *100 (1994) specified the role of a reviewing court as follows:
[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
The supreme court also explained the type of inquiry that we should perform to determine whether or not a trial court abused its discretion; namely, it stated:
[T]he theme that emerges is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id. at 1261 (emphasis added) (citations omitted).
We acknowledge that the award of general damages, in particular that granted to Mr. Odom, may be on the low end; however, from our review of the record in its entirety, viewed in the light most favorable to the prevailing party in the trial court, we cannot say that a rational trier of fact could not have fixed the awards of general damages at the level set by the jury or that this is one of those "exceptional cases where such awards are so gross as to be contrary to the right reason." Id. (quoting Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987)). Thus, we affirm the jury award of general damages.

CONCLUSION
For the aforementioned reasons, the judgment is affirmed. The defendants are cast with costs in the amount of $11,476.76.
AFFIRMED.
NOTES
[1] Inadequate supply of oxygen to the tissues. The American Medical Association Encyclopedia of Medicine, 1989.
[2] Ms. Fowler also had to cover homes 506 and 507.
[3] Ms. Means was assigned as Jojo's direct care person. She was also designated as the house manager for the evening, a position usually filled by Ms. Shelby Smith who was absent for the day.
[4] Opening of the neck where the trach was inserted.