696 So.2d 590 (1997)
Delta W. PELLERIN
v.
HUMEDICENTERS, INC., et al.
No. 96-CA-1996.
Court of Appeal of Louisiana, Fourth Circuit.
June 11, 1997.
Rehearing Denied July 31, 1997.
Edwin R. Fleischmann, Jr., Metairie, for Plaintiff/Appellee.
Franklin D. Beahm, Jeffery W. McDonald, Chehardy, Sherman, Ellis, Breslin & Murray, Metairie, for Defendants/Appellants.
Before BARRY, JONES and MURRAY, JJ.
JONES, Judge.
Delta Pellerin brought this medical malpractice action against Gwen Tangney, R.N., Galen-Med, Inc. d/b/a/ Lakeland Medical Center (a/k/a Humedicenters, Inc., d/b/a/ Humana, Inc.), Robert E. Gruner, M.D., Sterling *591 Drug, Inc., and Pfizer, Inc.[1], alleging she sustained injuries as a result of an improperly administered injection into her hip. The jury found in favor of plaintiff and awarded $90,304.68 in total damages. We affirm.

FACTS
Plaintiff went to the emergency room at Lakeland Medical Center complaining of chest pain on February 22, 1988. An emergency room physician, Dr. Robert Gruner, examined her and ordered Nurse Gwen Tangney to give her an injection consisting of 50 mg. of Demerol and 25 mg. of Vistaril. Although Nurse Tangney testified she did not recall giving the injection, she did not deny giving it and her initials are present in the emergency room record. Nurse Tangney further testified to what she routinely does when administering injections such as the one plaintiff received. She testified she would have injected an inch and one half long needle into the skin over the gluteal muscle, at a ninety degree angle, plunging down through the subcutaneous tissue and deep into the muscle. Before injecting the drug, she testified she would make sure the needle was not in a blood vessel. Nurse Tangney admitted she failed to record the site and mode of injection in the emergency room records. She said she may have written this information in the nurse's notes, but no such notes were admitted into evidence.
Plaintiff testified she felt pain and a burning sensation in her hip during the injection. According to testimony by Dr. Gruner, a burning sensation upon injection of Vistaril is common. However, the burning persisted afterward and progressively worsened over the next several weeks. The pain spread to an area approximately ten inches in diameter around the injection site and intensified when plaintiff engaged in activities that required planting her right foot. She could not sleep on her right side, work, perform household chores, or participate in sports without experiencing pain. She also testified she had a lump around the injection site and her skin was numb in that area.
Plaintiff further testified she consulted her gynecologist, Dr. Farrell, in April 1988. After examining the area of the injection, he recommended she see a neurologist. He referred her to Dr. Thomas Krefft, whom she first saw on April 27. Dr. Krefft found decreased sensation to pin pricks and cold in an area of two by four centimeters at the edge of plaintiff's hip. He diagnosed her with right cutaneous gluteal neuropathy (improper functioning of a nerve running right under the skin in the right buttock region). Dr. Krefft prescribed a medication for nerve pain. However, plaintiff returned on June 21, complaining of continuing pain despite taking the medication. At that time, Dr. Krefft recommended physical therapy, which was started on June 30, with Charles Reynolds. According to plaintiff's testimony, the physical therapy involved massages, ultrasound and use of a TENS unit (an electrical skin stimulator which helps block pain while it is being used). Mr. Reynolds testified he never felt any lump on plaintiff's body.
Plaintiff's next visit to Dr. Krefft occurred on August 3. She reported that she continued having sharp pain in her hip. She had stopped taking the pain medication, but the physical therapy and TENS unit were helping. The numbness in her skin was also improving. At the next visit on August 31, 1988, she said she was using the TENS unit every day and was feeling better.
On October 3, plaintiff saw Dr. Krefft's associate, Dr. Debra Burris. At that time, plaintiff had continuing pain in the right hip that came and went twice a day. Most of the numbness had disappeared, but Dr. Burris found decreased sensation to pin prick, touch and cold. She recommended plaintiff start using the pain medication again, continue use of the TENS unit, and return to Dr. Krefft in one month.
Plaintiff did not see Dr. Krefft again until the following year. Shortly before returning to him she started physical therapy with *592 Anthony Macalusa, which lasted from March 30 to May 23, 1989. On April 17, 1989, she saw Dr. Krefft because the TENS unit was irritating her skin and the pain in her hip was still severe, especially while sitting. She told him she was going to physical therapy three times a week and was able to sleep most nights. Dr. Krefft recommended she continue use of the pain medication.
Plaintiff returned for her last visit with Dr. Krefft on May 24, 1989, with complaints similar to the previous visit. Dr. Krefft referred her to Dr. Richard Morse, a pain management specialist at the Touro Pain Clinic.
Plaintiff first came to the Chronic Pain Clinic at Touro Infirmary in June of 1989. Dr. Morse testified plaintiff reported she had pain two-thirds to three-quarters4 of her waking hours and her sexual activity had decreased by about forty percent. Dr. Morse concluded something had irritated the nerves in the soft tissues below the skin along the thigh and caused some tissue irritation or scarring as well. He also testified she was moderately depressed. Plaintiff was treated with medication and physical therapy. She was also taught methods for coping with pain. Her last visit was on September 30, 1989. Plaintiff testified that by the time she concluded treatment at the clinic, she had obtained a 50% reduction in pain.
At trial, plaintiff testified she continued to have stabbing, burning pains which occurred weekly or every other week. She no longer needed a TENS unit, but she had not returned to running or participating in other sports because she feared it might cause extreme pain. According to her testimony, the lump around the injection site disappeared sometime in 1993.
In 1990, a medical review panel rendered an opinion in favor of Dr. Gruner, Nurse Tangney and the hospital, finding no breach of the standard of care. However, at trial in 1996, the jury returned a verdict in favor of plaintiff and against Nurse Tangney and awarded $90,304.68 in damages.

DISCUSSION AND LAW

VERDICT
"To prove medical malpractice, the plaintiff must establish by a preponderance of the evidence: the standard of care, a breach of that standard, causation, and damages." La. R.S. 9:2794; Bradford v. O'Neill, 95-2449, 95-2450 (La.App. 4 Cir. 11/20/96); 688 So.2d 33. A determination of whether a hospital has breached the duty of care owed to a particular patient depends on the facts and circumstances of the case, and in finding or refusing to find a breach of duty, the fact finder has great discretion. Parker v. Centenary Heritage Manor Nursing Home, 28,401 (La.App. 2 Cir. 6/26/96); 677 So.2d 568, writ denied, 96-1960 (La. 11/1/96); 681 So.2d 1271. To reverse a fact finder's verdict, the appellate court must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
Defendants argue the evidence showed plaintiff's injury could not have been caused by Nurse Tangney breaching the standard of care required of nurses. They contend plaintiff's injury was proven to be a complication from a properly administered injection rather than a result of Vistaril being injected in subcutaneous tissue. We disagree. While we may have rendered a different verdict, we cannot say the jury's verdict is manifestly wrong.
Dr. Gruner and Dr. Gary McGarity (plaintiff's expert in pharmacology) testified that Vistaril can cause tissue damage if it is not injected into the muscle. Dr. Krefft testified plaintiff had nerve damage. Dr. Krefft did not notice a lump in plaintiff's hip, but he testified that if Vistaril is injected into subcutaneous tissue, it is possible for a lump to form there. He further testified that damage to the nerve is consistent with damage to subcutaneous tissue, which can occur from injection of Vistaril into that tissue. Dr. Krefft qualified this, however, by stating an injection of anything could cause nerve damage because the needle itself could be responsible. Both Dr. Krefft and Dr. Robert Chugden (a member of the medical review panel and defense expert in emergency room medicine) testified cutaneous neuropathy is *593 more likely to be caused by the mechanics of injecting a needle than by the drug being injected. Examined in its entirety, however, Dr. Krefft's testimony indicates ambivalence concerning the cause of plaintiff's injuries. When pressed into making a choice between which was more likely, Dr. Krefft testified that either the Vistaril or the needle itself could have caused the nerve damage in this case.
Clearly, the jury was confronted with a great deal of conflicting testimony. Dr. Chugden testified hitting a subcutaneous nerve while administering an injection was more likely than missing one, and he believed the needle itself probably caused the nerve damage. Dr. Gruner, on the other hand, testified the chances of hitting a nerve are minimal. "Where two permissible views of the evidence exists, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State, 617 So.2d 880 (La.1993).
Defendants also argue the jury had no basis for believing plaintiff ever had a lump in her hip. It is true that no one other than plaintiff testified to the existence of the lump, but the testimony of Dr. Chugden and Dr. Krefft supports plaintiff's story and supports the verdict. According to Dr. Krefft, it was possible for a lump to form in plaintiff's hip because an injection of Vistaril into subcutaneous tissue can damage the nerve and cause a lump. Dr. Chugden testified a hardened nodule formed from damaged tissue cannot disappear, but he also stated it is possible for a nodule to reabsorb before it hardens. Based on this testimony, it was not unreasonable for the jury to believe plaintiff had a lump in her hip that later reabsorbed.
The verdict of the jury is very much supported by the record. Nurse Tangney admitted she failed to record the site and mode of injection in the emergency room records. According to the testimony of Bonnie Meeker and Gordon Natal, the two experts in nursing practice, failing to record this information is below the standard of care for nursing. While these omissions could not have affected the administration of the injection, they tend to indicate that in this instance Nurse Tangney did not follow accepted procedure while performing her job. The nurses' testimony alone would not necessarily be enough to support the jury's decision, but when it is added to the other evidence presented, the jury's verdict cannot be said to be manifestly erroneous or clearly wrong.

AWARD
The jury awarded a total of $90,304.68 in damages. They awarded $8,222.95 for past medical expenses; $14,081.73 for past lost earnings; $48,000 for past, present, and future physical and mental pain, suffering, and disability; and $20,000 for loss of enjoyment of life. Defendants argue the awards for pain and suffering and loss of enjoyment of life are excessive. Based on the assumption plaintiff underwent 17 months of treatment for a lump that self resolved, defendants contend only $15,000 in general damages is reasonable.
However, the jury was presented with evidence plaintiff sustained more than a self-resolving lump. Plaintiff had chronic pain from the time she received the injection in February of 1988 to the time of trial in January of 1996. She could no longer sleep on her right side and her sexual activity was reduced by forty percent. She needed to take medication and use a TENS unit just to keep the pain at a manageable level. Plaintiff further underwent 17 months of physical therapy and doctor visits. By the time she saw Dr. Morse, she was moderately depressed and at the time of trial, plaintiff still had stabbing, burning pains which occurred weekly or every other week. Prior to sustaining this injury, plaintiff often played racquetball, softball, and tennis. At least as of the time of trial, she no longer participated in any of these activities because she feared running would be painful.
Plaintiff testified she was unable to work or perform household chores without pain. In fact, plaintiff testified she was on medical leaves of absence during various portions of 1988, 1989, and 1990. Plaintiff further testified that in 1988, she missed work due to her injury 409.5 hours or a total of approximately 51.1 days of work; in 1989 she missed 1102.5 hours or a total of 137.8 days of work; and *594 in 1990 she missed a total of 23.5 hours or approximately 2.9 days of work.
Dr. Krefft testified plaintiff never gave him any reason to doubt she was experiencing the pain and other symptoms she reported. Dr. Krefft also testified that the medical records he reviewed at trial contained copies of three medical leave certificates that he had given plaintiff. A certificate dated March 27, 1989 was to be in effect until April 30, 1989. That certificate was renewed on April 27 and was scheduled to expire on June 2, 1989. That certificate was renewed on May 24, 1989 and extended her medical leave until June 30, 1989. Dr. Krefft did not have copies of any medical certificates given to plaintiff in 1988. His notes indicated she was off work and they were talking about her going back to work.
The trier of fact is vested with great discretion in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Given the length of time the effects of the injury lasted, the detrimental effects on plaintiff's ability to work and/or enjoy sports activities, the inconvenience occasioned by having to attend physical therapy, and the pain and suffering plaintiff underwent, we cannot say the jury's award is "beyond that which a reasonable trier of fact could assess" for the effects of plaintiff's injury. Id. at 1261.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
BARRY, J., dissents with reasons.
BARRY, Judge, dissenting.
The majority states that omissions from the medical records "could not have affected the administration of the injection, [but] they tend to indicate that in this instance Nurse Tangney did not follow accepted procedure while performing her job." That is an overreaching statement; it does not logically follow or reflect the law. In Green v. Dupre, 520 So.2d 761 (La.App. 3d Cir.1987), writ den. 522 So.2d 568 (La.1988), the plaintiff appealed a jury verdict for the defendant and claimed that the physician's method of record-keeping was inadequate. The court held that the jury did not err by finding no causation due to no evidence indicating that an omission in record-keeping resulted in the alleged malpractice or the patient's injury. Id. at 769.
The evidence establishes that Pellerin sustained damage to a cutaneous nerve, one of a web of nerves located just under the skin. Three witnesses agreed that the damage was likely caused from the needle and was unrelated to the medication. Though the testimony conflicts as to whether hitting such a nerve is a common or remote occurrence, no one testified that hitting the nerve constitutes a deviation below the standard of care.
The verdict is only supported by testimony concerning the existence and cause of a lump at the injection site, which suggests that the shot was improperly administered. Registered nurse Gordon Natal testified that injection of Vistaril into subcutaneous tissue (rather than into the muscle) would constitute a deviation below the standard of care for a nurse. The medical record did not reflect the method of injection, and there was no direct evidence that the Vistaril was injected into the subcutaneous tissue. Nurse Tangney did not recall giving Pellerin the shot but testified that she normally would administer it deep into the muscle. Pellerin testified that a lump formed at the injection site then later receded.
There was testimony that the medication can sometimes "leak" out of the injection site into the tissue over the muscle. The amount of leakage was unclear, and no one testified whether such leakage could cause a lump.
The jury apparently believed Pellerin. However the medical evidence does not support a finding, as a matter of law, that there was a deviation from the standard of care.
NOTES
[1] Sterling Drug, Inc. was dismissed before trial without prejudice upon motion by plaintiff; Pfizer, Inc. was dismissed with prejudice after the court granted summary judgment in its favor; and Robert Gruner, M.D., upon motion by plaintiff, was dismissed with prejudice after he testified at trial.