820 So.2d 1204 (2002)
In re Arthemise TRISS Applying for Medical Review Panel.
Arthemise E. Triss
v.
James Robert Davis, M.D., Keith Ferdinand, M.D., Pendleton Memorial Methodist Hospital, St. Paul Fire and Marine Insurance Company and Louisiana Medical Mutual Insurance Company.
Nos. 2001-CA-1921, 2001-CA-1922.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 2002.
*1205 Harry T. Widmann, Harry T. Widmann & Associates, Metairie, LA, for Plaintiff/Appellee.
Charles E. Boggs, Boggs, Loehn & Rodrigue, New Orleans, LA, for Defendant/Appellee, Keith C. Ferdinand, M.D.
Suzanne P. Keevers, Metairie, LA, for Defendant/Appellant, Pendleton Memorial Methodist Hospital.
George E. Cain, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, for Appellant, Intervenor, the Louisiana Patients' Compensation Fund.
(Court composed of Judge STEVEN R. PLOTKIN, Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE).
PATRICIA RIVET MURRAY, J.
This is a medical malpractice action. Defendant, Pendleton Memorial Methodist Hospital ("Methodist"), and intervenor, the Louisiana Patients' Compensation Fund (PCF), appeal the trial court's judgment awarding plaintiff, Arthemise Triss, damages against them. Ms. Triss cross-appeals the trial court's finding that the negligence of her treating cardiologist, Dr. Keith Ferdinand, did not result in her *1206 damages. For the following reasons, we affirm.

FACTS
In December 1992, Ms. Triss, who was fifty-seven years old, presented at Methodist emergency room with complaints of shortness of breath and chest pains. Ms. Triss had a history of smoking cigarettes for a decade, borderline diabetes, high blood pressure, obesity, and a family history of cardiovascular disease. Dr. James Davis, her family practitioner and attending physician, admitted her into the hospital; her admitting diagnosis was atrial fibrillation.[1] Given her history and the nature of her condition, Dr. Davis consulted a cardiologist, Dr. Ferdinand.
As a diagnositc tool, Dr. Ferdinand recommended that Ms. Triss undergo a coronary angiogram. Ms. Triss signed a written consent form acknowledging that she had been informed of the risks of the procedure. Dr. Ferdinand explained to her that those risks included a possible blood clot. On December 14, 1992, Dr. Ferdinand successfully performed the procedure, which involved accessing Ms. Triss' femoral artery at the right groin, in the cardiac catherization laboratory (the "Cath Lab"). At about 9:00 a.m., Dr. Ferdinand completed the procedure, dictated his report, left the hospital, and returned to his office.
Pursuant to standard protocol, the nursing staff was instructed to follow Dr. Ferdinand's typed list of routine post catheterizations orders. The first on that list, and the one pertinent to the instant case, required the nursing staff to check "[v]ital signs and pedal pulses q [i.e., every] 15 min × 2 hrs, then q 30 min × 1 hr, then q 2 hrs routine." To facilitate that routine protocol, a form labeled "Post Cardiac Cath Check List" was used. Indeed, Dr. Ferdinand's first routine order is handwritten on top of the copy of that Check List from Ms. Triss' procedure that appears in the record. As ordered, the nursing staff regularly recorded Ms. Triss' blood pressure, heart rate, respiratory rate, and temperature on that form at the prescribed time intervals. What is not recorded on that Check List, however, is any entry under the column captioned "Pedal Pulse Palpable." Whether despite the admitted failure to record that data the nursing staff actually complied with the doctor's orders to check Ms. Triss' pulse is one of the dispositive issues in this case.
At 9:20 a.m., while Ms. Triss was still recovering in the Cath Lab, she voiced her first complaint of severe pain in her right leg. At that time, the nurses could not manually palpate a pulse in her right foot, but were able to detect a Doppler pulse.[2] The nurses notified Dr. Ferdinand of the diminished pulses and complaints of "severe" right foot pain. In response, Dr. Ferdinand gave new orders by telephone, which were recorded at 9:55 a.m. His new orders were as follows: (i) to administer increased dosages of pain medication (Demerol and Visteril) now and as needed; (ii) to check the foot every fifteen minutes; and (iii) to call him if there were any further problems.
It is not disputed that Ms. Triss was administered pain medication at that time and that she was not administered pain *1207 medication again that day until 3:10 p.m. What is disputed, and another of the dispositive issues in this case, is whether the nursing staff complied with Dr. Ferdinand's other two ordersto do fifteen-minute foot checks and to call him regarding any problems.
The medical records reflect that when Ms. Triss was given pain medication at 9:55 a.m., she again complained of pain and numbness in her right foot. At that time, the nurses notified Dr. Davis. Shortly thereafter, Dr. Davis saw Ms. Triss, apparently while she was still in the Cath Lab, and noted in the chart that she had returned from the angiogram at 9:50 a.m. complaining of right foot and right ankle pain that began after the angiogram. He further noted that he had informed Dr. Ferdinand of his findings of a "minor differential" in the temperature of the right foot in comparison to the left (the right foot was cooler than the left) and that there was a "slight pulse" on the right side.
At 10:15 a.m., Ms. Triss was returned to her room in the telemetry unit of the hospital.[3] On that unit, the nurse assigned to care for Ms. Triss was Deborah Perry, a licensed practical nurse. Nurse Perry's 10:15 a.m. note in the chart states that Ms. Triss returned to the floor with a bandaid and sandbag in place at the site,[4] stable vitals signs, and a positive Doppler pedal pulse. Although Nurse Perry testified that she followed Dr. Ferdinand's orders, the latter reference to a Doppler pulse is the only documentation Nurse Perry made in the hospital records regarding her checking the pulse in Ms. Triss' leg that day.
At 11:00 p.m., Ms. Perry telephone Dr. Ferdinand to report that Ms. Triss had a run of V-Trac (ventricular tachycardia). Ms. Perry, however, made no mention of Ms. Triss complaining of foot pain. Despite Nurse Perry's testimony that she spoke with Dr. Ferdinand throughout the day, this phone call is the only one she documented making and is the last one documented in the chart until 5:15 p.m. that afternoon.
At 12:35 p.m., Nurse Perry's note to the chart states that Ms. Triss was "comfortable in bed" with no pain medications being requested or given; rather, this note states that Ms. Triss "does not want anything for pain. States she can endure. NAD [no acute distress] noted. Remains stable."
Although neither Nurse Perry, nor Ms. Triss recall his visit, Dr. Davis wrote in the chart at 1:25 p.m. that he saw Ms. Triss, that she "feels better" and voiced no complaint of foot pain. He additionally wrote that they discussed lifestyle changesdiet and exerciseand her returning to work after Christmas.
At 2:00 p.m., Nurse Perry's note states that Ms. Triss' assessment is unchanged from 12:30 p.m. Between 2:30 and 3:00 p.m., Ms. Perry's shift ended, and a new nurse took over Ms. Triss' care. Methodist did not call the new nurse as a witness at trial. At 3:10 p.m., Ms. Triss requested and, as noted, was administered pain medication for the first time since 9:55 a.m. At 4:00 p.m., Ms. Triss complained of right *1208 leg pain and stated that she wanted the sandbag taken off of her groin area. At that time, the new nurse wrote that Ms. Triss' pedal pulse was "faint but palpable," that the right foot was cooler to touch, and that her family was at her bedside. The latter notation was the first mention in the medical records of family members being present that day. Indeed, even when confronted with family members testimony to the contrary, Nurse Perry denied seeing any family members present.
Sometime between 4:00 and 5:00 p.m., the new nurse telephoned Dr. Ferdinand and notified him of these changes in Ms. Triss' condition. At 5:15 p.m., the chart reflects that Dr. Ferdinand gave new orders by telephone to administer Valium and to remove the sandbag. At that time, the nurse complied with those orders. At 5:30 p.m., fifteen minutes after being called for a consult by Dr. Ferdinand, Dr. Johnny Gibson, a thoracic and vascular surgeon, evaluated Ms. Triss.[5] Upon examining her, Dr. Gibson determined that the most expedient thing to do would be to go directly to surgery. In his report, Dr. Gibson describes Ms. Triss' right leg at the time he saw her as having a zero pedal pulse, as "ashen" in color, and as cool in temperature. He also testified that there was no blood flowing through the artery. At about 6:30 p.m., Dr. Gibson performed a femoral embolectomy, which is a surgical operation to remove a blood clot.
Following the surgery, Ms. Triss was hospitalized for another five days. During that interval, Ms. Triss' family members questioned Dr. Davis regarding the lengthy interval between her initial complaint of leg pain and the surgery. Indeed, the chart reflects Dr. Davis documented that Ms. Triss' family inquired on both December 16th and 17th, 1992 about the lengthy treatment delay.[6]
Although the surgery was successful in restoring blood flow to Ms. Triss' lower right extremity, she experienced trouble walking while still in the hospital. Her trouble walking continued and worsened; the medical term for the condition she developed is claudication. Claudication is a "condition caused by impairment of the arteries." P.H. Collin, Dictionary of Medicine (3rd ed.2000). "[A]t first, the patient limps after having walked a short distance, then finds walking progressively more difficult and finally impossible. The condition improves after rest." Id. According to Ms. Triss, walking more than 100 yards results in her foot becoming numb and painful; stopping and resting alleviates her symptoms and thus she has not required medication, except for occasional Tylenol. The cause for this condition, according to Ms. Triss, was the several hours of inadequate blood flow to her leg.

PROCEDURAL HISTORY
Ms. Triss filed a medical malpractice complaint pursuant to the statute. In her complaint, she asserted that Drs. Ferdinand and Davis and the nursing staff of Methodist violated the applicable standard of care by failing to timely treat a complication *1209 of the angiogram. In August 1995, a single medical review panel was convened to hear these claims. The panel consisted of three cardiologists and an attorney-chairman. The panel unanimously concluded that neither the doctors, nor the hospital breached the applicable standard of care.[7] The panel gave the following reasons. As to Drs. Davis and Ferdinand, the panel found that:
1. The patient was documented to be clinically stable with no evidence of limb threatening ischemia until 5:15 p.m.
2. Drs. Davis and Ferdinand responded appropriately.
3. At 5:30 p.m. the consulting surgeon responded in a timely and appropriate fashion.
As to Methodist, the panel found:
1. The patient was adequately assessed preoperatively, operatively and postoperatively.
Ms. Triss then commenced this medical malpractice suit against the same health care providers. The trial court denied Methodist's motion for summary judgment, but granted Dr. Davis' motion.[8] The sole defendants at trial were thus Dr. Ferdinand and Methodist.
In January 2001, a five-day jury trial was held at which four experts, several of Ms. Triss' treating physicians, and several lay witnesses were called to testify. At the close of plaintiff's case, Methodist moved for a directed verdict. The trial court denied that motion and found that the issue of the nursing staff's negligence was one for the jury to resolve. Ultimately, the jury exonerated Dr. Ferdinand from fault and found Methodist, through its nursing staff, solely at fault. The jury further found that Methodist's fault caused injury to Ms. Triss and itemized her damages as follows: $150,000 for pain and suffering past and future, and $110,000 for mental anguish and emotional distress.
On February 8, 2001, the trial court signed a judgment conforming to the jury's verdict. Given the stipulation at trial that Methodist was a qualified health care provider and the statutory ramifications resulting from that status, the trial court cast Methodist in judgment for the first $100,000 and cast the PCF for the remaining $160,000. From that judgment, Methodist filed a motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial, or remittitur. On June 25, 2001, the trial court denied those post-trial motions.[9] The trial court granted the PCF's motion to intervene and to appeal.
On appeal, the PCF argues that there is no evidence in the record supporting the jury's finding that the fault of Methodist, through its nursing staff, caused any damages to Ms. Triss or that she sustained damages totaling $260,000. PCF argues that the "inordinately large" damage award establishes that the jury abused its vast discretion.
Methodist makes the same arguments as the PCF, but adds that the jury was manifestly *1210 erroneous in finding it at fault.[10] Methodist argues that the jury's disregard of the uncontested medical records establishing Ms. Triss' condition improved midday was manifestly erroneous. Methodist further argues that it was inconsistent for the jury to absolve from fault the treating cardiologist who was actively managing the complication, yet to find fault on the part of the hospital, through its nursing staff. Methodist still further argues that even assuming a breach could be established on the part of its nursing staff, causation could not be established given that virtually all of the experts agreed that nothing the nursing staff did or failed to do affected the outcome.
On cross-appeal, Ms. Triss argues that in the event this court accepts the arguments advanced by Methodist and PCF that it was unreasonable to cast Methodist, through its nursing staff, at fault, while exonerating Dr. Ferdinand, then she argues that it was error for the jury to fail to assess any fault to Dr. Ferdinand. As to Dr. Ferdinand's fault, Ms. Triss argues that Dr. Ferdinand viewed this as a medication issue, and thus delayed acting upon Ms. Triss' complaints of right foot pain until the 3:10 p.m. pain medication proved utterly ineffective. Ms. Triss contends that her pain was "the prime indicator of leg endangering ischemia" and that Dr. Ferdinand breached the standard of care in failing to intervene earlier.

DR. FERDINAND'S FAULT
At the outset, we address Ms. Triss' argument that the jury erred in failing to assess any fault to Dr. Ferdinand. At trial, Ms. Triss sought to establish fault on the part of Dr. Ferdinand through the expert testimony of Dr. Jim Hirschman, a Miami, Florida cardiologist. Dr. Hirschman, who the trial court qualified as an expert in the fields of cardiology and internal medicine, opined that Dr. Ferdinand breached the standard of care in cardiology by failing to come to the hospital to see Ms. Triss after being informed at 9:30 a.m. by the nursing staff and at 9:55 a.m. by Dr. Davis of Ms. Triss' severe pain in her right leg.
According to Dr. Hirschman, if Dr. Ferdinand had come to the hospital after 9:55 a.m., non-surgical options were available that he could used to prevent injury to Ms. Triss' leg. In particular, Dr. Hirschman testified that "[t]here are medications that can be given, like, Papaverine. There are blood thinners, like, Heparin that can be given. There are medications that can help relieve spasms, other than Papaverine." He further testified that surgery is a last resort and suggested that other tests could have been used. In short, Dr. Hirshman faulted Dr. Ferdinand, who was the specialist that performed the procedure that resulted in the complication, for failing to come and evaluate the situation himself and for simply waiting several hours to see if the complication would naturally self-correct. That several hour delay during which Ms. Triss had an inadequate blood flow to her right leg, he opined, caused her to develop claudication.
In rebuttal, Dr. Ferdinand strongly defended his "wait and see" approach to managing the complication Ms. Triss developed following the angiogram. He denied that he would not have used either of the medications suggested by Dr. Hirshman. Dr. Ferdinand acknowledged that the nursing staff informed him that Ms. Triss was in "some pain." Dr. Ferdinand also acknowledged that Dr. Davis called him twice, once that morning from the Cath Lab and once mid-afternoon, but he could not recall the time of the latter call.
*1211 Dr. Ferdinand's "wait and see" approach was approved as within the standard of care by the three cardiologists who were members of the medical review panel, the two cardiologists who testified on Dr. Ferdinand's behalf, and Dr. Gibson, Ms. Triss' surgeon.
One of Dr. Ferdinand's cardiology experts was Dr. Tyrone Collins. Dr. Collins, who was qualified as an expert in internal medicine and cardiovascular disease, opined that Dr. Ferdinand's actions in "monitoring this patient with persistence of the nursing staff and admitting interns [sic], Dr. Davis, and, then, when the patient's symptoms became much worse at 5:15, consulting of the vascular surgeon" met the standard of care for a cardiologist. Asked about the possibility of using Heparin to keep a clot from forming, he responded that it was a potential treatment but that not using Heparin was "certainly not a deviation from the standards." He further testified that it was reasonable to wait and see given "most of the times, they get better without us having to give Heparin or do surgery." As to the use of Papaverine, he testified that this is an old medicine that is used more for a diagnostic, than a therapeutic, tool. Asked whether performing the surgery earlier at 2:00 p.m. instead of 5:15 p.m.would have affected her current complaints, he responded that the only difference would have been that "[s]he would have been the owner of a [surgical] scar a few hours earlier."
Dr. Ferdinand's other cardiology expert was Dr. Cook, who was qualified as an expert in internal medicine and cardiovascular disease, agreed with Dr. Collins' latter statement. Dr. Cook also denied that he would use Papaverine and that the use of Heparin would not be the standard of care and could have caused a "catastrophe." Dr. Cook explained that he subscribed to Dr. Ferdinand's "wait and see" approach because "in this particular case, you have to give the patient some time to declare themselves as to whether they're going to get better or not."
Dr. Cook testified that after an angiogram, one complication that can occur is an arterial spasm, which causes the vasculature to constrict and "the profusion is not as good with blood down the leg." As a result, this may cause foot pain, which will resolve itself with time. Dr. Cook further noted that another possible cause for postangiogram foot pain is pre-existing vascular disease in the lower extremety, which he agreed Ms. Triss had.
Explaining the significance of Ms. Triss' having a Doppler pulse, Dr. Cook testified that "she had profusion into the foot of her lower extremity" and that "[t]he blood is getting there." Dr. Cook further testified that the most important thing to monitor is "interruption of the circulation, because interruption of the circulation can cause damage. If the pulse is present, you know the circulation is not interrupted." Hence, Dr. Cook opined that as long as the profusion was present, no intervention is needed. To determine the presence of profusion, he testified that "you determine, by looking at it and feeling for temperature, et cetera." Further explaining, Dr. Cook testified:
[A]s long as the pulses are in tact, I think what you want to do is to make sure that they don't go away. So, what you do is your [sic] check the pulses frequently. And, I think that that's what should have been done, is it should have been checked frequently, and the Doctor should have been notified to make the decision whether anything else needed to be done.
Dr. Cook thus characterized the proper approach as one of "watchful waiting" with an eye towards surgery as a last resort.
*1212 As noted, Dr. Johnny Gibson, who was qualified as expert in general, thoracic and vascular surgery and who performed a femoral embolectomy on Ms. Triss, also agreed with Dr. Ferdinand's "wait and see" medical management approach. Dr. Gibson testified that Heparin was contraindicated and would not help dissolve the clot. He further testified that if he had seen her earlier when she had a palpable or Doppler pulse and was feeling better he "probably would not have felt an urgency to operate on her at that time."
It is well-settled that "where two permissible view of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State Dep't of Transp. & Dev., 617 So.2d 880, 883 (La.1993). Such is the case here. Given the conflicting expert testimony, we cannot say that the jury was manifestly erroneous in failing to find Dr. Ferdinand at fault.

HOSPITAL'S FAULT
Methodist was sued based on the alleged negligence of its nursing staff. At trial, the relevant allegation of the petition sought to be established was that the use of only Doppler pulses was inadequate to evaluate ischmia because "only minimal blood flow is required to get a positive [D]oppler reading" and that "[n]urses in attendance of Mrs. Triss in the circumstances of the pain and numbness in her right extremity should have relied on their feel for pulses and extremity color and temperature."
A hospital is responsible for the negligence of its nurses under the respondeat superior doctrine. Gibson v. Bossier City General Hosp., 594 So.2d 1332, 1343 (La.App. 2d Cir.1991). "[T]he liability imputed upon the hospital must be viewed in light of the nurses' actions." Odom v. State, Dep't of Health & Hospitals, 98-1590, p. 7 (La.App. 3 Cir. 3/24/99), 733 So.2d 91, 96. Nurses, including licensed practical nurses, are defined as qualified health care providers under La. R.S. 40:1299.41(A)(1).
In addressing the applicable standard of care for nurses, the jurisprudence has held:
"Nurses and other health care providers are subject to the same standard as physicians. It is a nurse's duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case."
Migues v. Sagrera, 620 So.2d 463, 465 (La.App. 3d Cir.1993)(quoting Novak v. Texada, Miller, Masterson and Davis Clinic, 514 So.2d 524, 526 (La.App. 3d Cir.1987)). It follows then that under La. R.S. 9:2794, the plaintiff must satisfy three requirements to prove a nurse's negligence:
(1) she must exercise the degree of skill ordinarily employed, under similar circumstances, by the members of the nursing or health care profession in good standing in the same community or locality;
(2) she either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with her best judgment in the application of that skill; and
(3) as a proximate result of this lack of knowledge or skill or failure to exercise this degree of care, the plaintiff suffered injuries that would not, otherwise, have occurred. *1213 Odom, 98-1590, pp. 7-8, 733 So.2d at 96-97. Thus, the plaintiff must establish the standard of care applicable to the nurse, a violation by the nurse of that standard of care, and a causal connection between the nurse's alleged negligence and the plaintiff's injuries resulting therefrom. See Pfiffner v. Correa, 94-0924, p. 8 (La.10/17/94), 643 So.2d 1228, 1233.
Due to the complex medical and factual issues generally involved in medical malpractice cases, a plaintiff ordinarily will not be able to satisfy that burden of proof without expert testimony. Nonetheless, "there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can." Pfiffner, 94-0924 at p. 9, 643 So.2d at 1234. Two illustrations are "[f]ailure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary." Id; Coleman v. Deno, XXXX-XXXX, p. 20 (La.1/25/02), 813 So.2d 303, 317. The alleged negligence of Methodist's nursing staff falls within this category.
This is a case in which the alleged wrongful conduct can be evaluated based on common knowledge. As discussed elsewhere, a critical consideration in this case is the nursing staffs failure to chart compliance with the doctor's orders. The inferences that flow from that failure that the nurses complied but did not record it or failed to comply"is well within the province of the jury applying their knowledge of human nature to their observations of the witnesses." Dent v. Perkins, 598 So.2d 1101, 1105 (La.App. 4th Cir.1992). The jury in this case was capable of determining whether or not Nurse Perry and the other members of the nursing staff were negligent for failing to adequately monitor Ms. Triss' foot and report her complaints of pain to Dr. Ferdinand.
As noted, the jury found that Methodist, through its nursing staff, breached the standard of care applicable for nurses and that the breach caused injury to Ms. Triss. On appeal, Methodist argues that the jury's findings were unreasonable for four reasons:
 It was unreasonable to award judgment against the hospital where plaintiff fails to establish the appropriate standard of nursing care for monitoring patients in Louisiana.
 It was unreasonable for a jury hearing a medical malpractice case to find "facts" based upon oral testimony which is contradicted by documentation in the medical records.
 It was unreasonable to award judgment against the hospital where virtually all medical experts testify that the nurses' alleged transgressions made no difference to the outcome of the case.
 It was unreasonable for a jury to exonerate the doctor actively managing a complication, and decide against the nurses, where plaintiff's liability expert testifies that the doctor's management choice caused damages over time, notwithstanding the presence of leg pulses or the inability of nurses to do anything more than tell the doctor about the foot pain, slight coolness, and diminished pulses.
We separately address each of these arguments.
First, the applicable standard of care for nurses, according to Methodist, was to notify the physician only in the event of a "substantial change" in the patient's *1214 condition.[11] We find that statement of the applicable duty fails to recognize that the duty must be tailored to the facts of the particular case. See Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law, § 5-1 (1996)(noting that the duty issue in a particular case is whether the general duty to exercise reasonable care "extends to protect the plaintiff against the particular risk that occurred, in the particular manner in which it occurred.")
Contrary to Methodist's contention, we find the record in this case adequately establishes that the duty of its nursing staff was to follow the doctor's orders, to monitor Ms. Triss' condition, and to keep the doctor informed. See Jones v. Shepard, 99-1916, p. 4 (La.App. 3 Cir. 5/3/00), 760 So.2d 554, 556 (defining duty as "to notify the doctors of significant changes or any changes the doctor has requested he be notified about") (Emphasis supplied). Indeed, we find it significant that the experts that voiced their approval of Dr. Ferdinand's wait and see approach did so based on the assumption that the nursing staff was performing this duty of adequately monitoring Ms. Triss' foot. As quoted above, Dr. Cook testified that "[Ms. Triss' pulses] should have been checked frequently, and the Doctor should have been notified to make the decision whether anything else needed to be done."
Methodist's second argument is that the jury was unreasonable in finding facts based on testimony contradicting the medical records regarding Ms. Triss' midday status. Although Ms. Triss testified that she was in pain the entire day, the hospital records reflect her midday status as stable and comfortable in bed.[12] As noted above, the dispute over what was or was not documented in the medical record was a factual issue for the jury to decide "applying their knowledge of human nature to their observations of the witnesses." Dent, 598 So.2d at 1105.
At trial, Nurse Perry, a licensed practical nurse employed by Methodist, testified that she was the floor nurse in the telemetry unit responsible for Ms. Triss' care from 10:15 a.m. until 2:30 p.m., which was when her shift ended. Nurse Perry testified that she had four or five patients assigned to her that day and that at Methodist the nurses chart every two hours unless something significant occurs.
Nurse Perry acknowledged that she was aware of Dr. Ferdinand's 9:55 a.m. order to check Ms. Triss' right leg every fifteen minutes and to call him. She further testified that she checked the leg and that Dr. Ferdinand was aware that Ms. Triss was okay, that she had pedal pulses, and that there was no reason to call him to advise him of anything adverse. Asked to describe for the jury her actions when she went in Ms. Triss' room, Nurse Perry testified:
Ms. Triss and I had developed a repore [sic]. I thought we had a little something where she knew to call me if something was going on. At that time, I would take her blood pressure, her pulse, her respiration, check the sandbag, make sure that there was no bleeding *1215 at the site, and checking for the pulse. The Doppler is a small machine, portable, left on the bedside table, and that I could check it to make sure that there was still flow. By me not putting that it ever changed, it just meant that she still had a pulse.
My back and forth conversations with Dr. Ferdinand, I didn't see a change. You know, he was satisfied that she still had a pulse by Doppler.
As to her failure to chart, Nurse Perry acknowledged that the only entry that she made in the chart documenting that she checked Ms. Triss' pedal pulse was a 10:15 a.m. entry reflecting a positive Doppler pulse.
As to physically checking Ms. Triss' pulse, Ms. Perry testified:
Physically, to check a pulse, you would palpate. However, before being a nurse, I did hair. Afro American hair, we use a straightening comb. Straightening combs were very hot. I don't have very much sensation there. So, Doppler, being on the unit was used. And, if there is Doppler flow, there is flow.
According to Nurse Perry, Ms. Triss' chief complaint was the sandbag. Nurse Perry testified that she explained to Ms. Triss that the sandbag was necessary for pressure. Nurse Perry was questioned several times about visitors. Contrary to Ms. Triss' son's testimony that he arrived at 10:30 a.m. and stayed with his mother all day, Nurse Perry maintained that Ms. Triss had no visitors during her shift. Nurse Perry was not questioned about Dr. Davis' 1:25 p.m. visit. Overall, Nurse Perry characterized Ms. Triss' midday status as comfortable in bed, stable, and not voicing any complaints.
Consistent with Nurse Perry's testimony and chart entries, Dr. Davis made an entry in the chart documenting that he saw Ms. Triss at 1:25 p.m. That entry states that Ms. Triss was feeling better and voiced no complaint of foot pain. That entry also indicates that Ms. Triss and Dr. Davis discussed lifestyle changesdiet and exerciseand her returning to work after Christmas. At trial, Dr. Davis, due to personal health problems (a stroke), could only testify based on what was in the chart; he could not personally recall the events.
Methodist failed to call as a witness any of the other nursing staff who cared for Ms. Triss that day. Methodist, however, cites as further support for their position Dr. Cook's testimony that Ms. Triss' stable vital signs, normal blood pressure and pulse, throughout the day were consistent with the nursing staff's midday notes describing her as comfortable in bed without significant pain.
On the other hand, Dr. Hirschman, plaintiff's expert, testified that Dr. Davis' 1:25 p.m. chart entry and the nursing staff's midday notes were inconsistent with the rest of the day. Explaining that comment, Dr. Hirschman testified as follows:
Q How does it not fit?
A Well, we know that there was some concern or alarm, suspicion, about the foot as early as 9:55 a.m. We know that she required a hefty shot of Demerol and Visteril, together, about 9:55 a.m. And, we know that on, at least one observation, maybe two, there was a cool foot and no pulses palpable, enough so that Dr. Davis called Dr. Ferdinand. And, we now know that the foot was in critical condition later on in the afternoon. And, this just doesn't fit with the sequence of events as they've come together.
Q Sir, is it likely that an artery, following an angiogram, is going to have significant problems that would produce *1216 slight pulses, change in temperature, severe pain in the foot, then that artery is going to get better and produce no complaints and, then, a few hours after that, all of a sudden, it's going to be in extreme circumstances?
A No. You always hope, but it's unlikely.
Q Why?
A Becauseanything is possible. But, the artery is in trouble right from the morning. And, so, you need to stay on top of it until you know what the trend is going to be and so you can intervene before you have to get to the point of calling the surgeon.
The more likely scenario testified to by Dr. Hirschman was supported by the lay testimony of Ms. Triss, her family members and her friend. Ms. Triss testified that she was in pain all day and that the pain became really bad in the afternoon. Ms. Triss denied declining pain medication and denied ever seeing Dr. Davis that day. Ms. Triss' sons, daughter-in-laws, and friend all testified about Ms. Triss' condition when they went to visit her that day in the hospital. They all corroborated Ms. Triss' testimony that she was in pain throughout the day. It was also established that Ms. Triss' husband attempted to contact Dr. Davis that afternoon regarding his wife's condition.
The jury was thus presented with conflicting testimony regarding Ms. Triss' midday condition. The jury's finding that the nursing staff breached the applicable standard of care can be construed as adopting Ms. Triss' version that she was in pain the entire day and that the nurses failed to inform the doctor of her condition. Methodist's failure to call any of the nursing staff that cared for Ms. Triss other than Ms. Perry leads to an adverse presumption that the testimony of those uncalled witnesses would have been unfavorable.
Explaining that adverse presumption, we recently noted that "`[w]hen a defendant in a civil case can by his own testimony throw light upon matters at issue, necessary to his defense and particularly within his own knowledge, and fails to go upon the witness stand, the presumption is raised and will be given effect, that the facts, as he would have them do not exist.'" Taylor v. Entergy Corp, XXXX-XXXX, p. 14 (La.App. 4 Cir. 4/17/02), 816 So.2d 933 (citing Davis v. Myers, 427 So.2d 648, 649 (La.App. 5th Cir.1983)). We further noted that this adverse presumption is referred to as the "uncalled witness" rule and applies "when `a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence' and fails to call such witnesses" Id. (quoting 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 4.3 (1999)). We further noted that despite the advent of modern, liberal discovery rules, this rule remains vital, especially in cases, such as this one, in which witnesses with peculiar knowledge of the material facts are not called to testify at trial.[13]
Methodist's reliance on the contents of the hospital records as establishing the jury was unreasonable in finding it at fault was misplaced. The jury was entitled to weigh the evidence and obviously found Ms. Triss' version more credible. We cannot say that the jury's finding was manifestly erroneous. As noted, the jury's finding is supported by the adverse presumption, discussed above; Methodist's failure to call the other nurses who attended *1217 Ms. Tress left unrebutted the testimony by Ms. Triss and her family members that she was in unrelenting pain from 2:30 p.m. until her surgery.
The jury's finding is also supported by what was not documented in the hospital records. Although Nurse Perry testified that she followed Dr. Ferdinand's orders and checked Ms. Triss' pedal pulses, she documented doing so only once. Given Dr. Ferdinand's order to check Ms. Triss' foot every fifteen minutes, Nurse Perry should have been cautiously watching that foot. "One would expect thorough documentation to be a part of that caution; however, that was not done in this case." Pommier v. ABC Ins. Co., 97-1342, p. 12 (La.App. 3 Cir. 7/15/98), 715 So.2d 1270, 1278 (affirming finding of breach by nurses of standard of care); Pellerin v. Humedicenters, Inc., 96-1996, p. 6 (La. 4 Cir. 6/11/97), 696 So.2d 590, 593 (citing nurse's record keeping lapse as indicator supporting jury's finding nurse "did not follow accepted procedure while performing her job").
Methodist's third argument is that it was unreasonable for the jury to find against the hospital given that virtually all the medical experts testified that its nursing staffs alleged transgressions made no difference to the outcome. Regardless of whether the nursing staffs transgression is characterized as failing to do fifteen-minute foot checks, failing to chart in detail, or failing to notify Dr. Ferdinand of Ms. Triss' continuing pain, Methodist argues that, "in the opinion of virtually all of the medical experts," the outcome was not affected.
The experts' testimony to which Methodist is referring is the testimony supporting Dr. Ferdinand's wait and see approach. That expert testimony, as noted above, was based on the assumption that Ms. Triss' midday condition was stable and that the nursing staff was complying with its duty to carefully monitor that foot and assure the pulse remained. That underlying factual assumption, however, was rejected by the jury. Methodist's reliance on that same testimony as precluding a finding of causation is thus misplaced.
Addressing the testimony of plaintiff's expert, Methodist summarizes Dr. Hirschman's opinion on causation as being that "six hours of dopperable pulses were not adequate to avoid the damage which allegedly occurred" and that "the alleged damages accrued, or happened slowly over time" and thus Dr. Ferdinand had to intervene early "to stimulate sluggish circulation." Although Methodist argues that this testimony "marginalized the significance of the nurses' monitoring" and resulted in their role making no difference on the outcome, Ms. Triss counters that Dr. Hirschman's testimony supports a finding that Methodist, through its nursing staff, was responsible for the lion's share of the fault. Particularly, she notes that "Dr. Ferdinand could not be present all day long" and that "[t]he nurses failed to function as his eyes and ears" and thus "left Dr. Ferdinand in the dark."
It is well-settled that causation is a question of fact and thus governed by the manifest error rule. The jury accepted Dr. Hirschman's opinion that the several hours delay of diminished pulse more probably than not caused damage to Ms. Triss' leg and that the delay caused claudication. Although Methodist challenged the basis for Dr. Hirschman's expert opinion, arguing that it was based on a hypothetical with flawed factual assumptions, the record supports Dr. Hirschman's expert opinion, which in turn supports the jury's verdict on causation. See Cone v. National Emergency Services, Inc., 99-0934, pp. 6-7 (La.10/29/99), 747 So.2d 1085, 1088.
*1218 Methodist's fourth, and final, argument is that it was unreasonable for the jury to exonerate the doctor actively managing the complication, Dr. Ferdinand, and decide against the nursing staff. A similar argument was recently rejected by the Supreme Court in Deno, supra. There, Dr. Deno argued that the same evidence that established Dr. Sherman's freedom from fault likewise supported a finding in his favor. Admitting it was a "close call" but nonetheless rejecting that argument, the Supreme Court reasoned that "[t]he presentation Coleman made to Dr. Sherman was simply factually different from that confronting Dr. Deno. And, because we are guided by the manifest error rule, we must also disagree with Dr. Deno's argument that the jury was clearly wrong in finding fault on his part." Deno, XXXX-XXXX at p. 24, 813 So.2d at 319.
By analogy, the jury was persuaded by Ms. Triss' argument that her presentation to the nursing staff throughout the day was different from the condition the nursing staff communicated to Dr. Ferdinand. As Ms. Triss points out, the jury did not believe Methodist's version of the events that Ms. Triss' foot was stable midday and became ashen and pulseless in a matter of minutes later that afternoonbut rather found merit to Dr. Hirschman's opinion that the injury occurred "over time." We cannot say that finding was manifestly erroneous.

GENERAL DAMAGE AWARD
The jury awarded Ms. Triss $150,000 for past and future pain and suffering and $110,000 for past and future mental anguish and emotional distress.[14] "General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim's life." Delphen v. Dep't of Transp. & Dev., 94-1261, p. 13 (La.App. 4 Cir. 5/24/95), 657 So.2d 328, 336. The entirety of the damages awarded to Ms. Triss thus fall within the category of general damages, and we review the jury's award as one of $260,000 in general damages.
On the issue of damages, Ms. Triss introduced the testimony of Dr. John D. Olson, who was qualified in the field of neurology. Dr. Olson testified that he saw Ms. Triss on five occasions between October 1996 and July 1997. Dr. Olson testified that she presented with a history that suggested vascular claudication of the lower extremities with more problems in the right leg. He stated that she related the onset of this condition to a specific event; namely, "an embolus of the femoral artery or thrombus of the femoral artery" in the right leg. During the time he saw her, he noted that "she probably had some gradual worsening."[15]
Dr. Olson defined claudication to mean "a set of symptoms that are related to, in this situation, poor blood flow, poor arterial flow to the lower extremities. When the patient makes certain demands on the muscles in her leg, if circulation is borderline, the metabolic ability of the patient to supply those demands is outstripped and the patient feels a sensation of pain, cramping, coolness, that usually *1219 resolves to some extent with rest." He further testified that "it refers to a characteristic set of symptoms that are associated with out-stripping the body's ability to supply metabolic demands in this specific case for musculature in the lower extremities." The only other expert to testify on damages was Dr. Hirschman, whose testimony is discussed elsewhere.
As noted, both Methodist and PCF argue that the quantum awarded was excessive. In reviewing a general damage award, the first inquiry is "whether the particular effects of the particular injuries to the particular plaintiff are such that there has been an abuse of the `much discretion' vested in the judge or jury." 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 14.14 (1999). The standard of review for abuse of discretion in awarding general damages is "difficult to express and is necessarily non-specific." Cone, 99-0934 at p. 8, 747 So.2d at 1089. The seminal case on that standard is Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), in which the court articulated it as follows:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
623 So.2d at 1261.
In reviewing the jury's award of general damages in this case, we note that Ms. Triss' damage, claudication, is a permanent one. The significance of this fact is that a plaintiff who suffers permanent injuries generally suffers "some loss of enjoyment of life." Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law, § 7-2(c)(1996). Thus, the permanent aspect of Ms. Triss' condition supports the jury's award of past and future mental anguish and emotional distress. And, we find, as Ms. Triss argues, that the pain and suffering component is supported by the fact it encompasses three-subcomponents: (1) avoidable pain on December 14, 1992, the day of the angiogram; (2) post-surgical pain and discomfort; and (3) claudication. While the amount of general damages awarded is generous, we cannot say, applying the Youn standard, that it is an abuse of discretion. We thus find it unnecessary to resort to a review of damage awards made in other cases.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Costs are assessed against Methodist and the PCF.
AFFIRMED.
NOTES
[1] Atrial fibrillation means "rapid uncoordinated fluttering of the atria of the heart, causing an irregular heartbeat." P.H. Collin, Dictionary of Medicine (3rd ed.2000).
[2] A Doppler device is named after an Austrian physicist "who said that you can tell how well something is flowing by sound." Although the most well-known use for a Doppler device is in weather forecasting, a Doppler device is used in medicine to detect a pulse.
[3] The telemetry unit is a special area of the hospital dedicated to patients with cardiac problems. In that unit, telemonitors are used. Telemonitors have a picture of each patient's rooms. Sensors are put on the patient's chest so that they can be monitored on a twenty-four hour basis. The monitors are watched and strips are run on each patient.
[4] At that time, it was an accepted practice to use a sandbag after an angiogram for pressure and to remind the patient of the need to keep the leg still.
[5] In the transcript, Dr. Gibson's name is spelled as both Dr. Gibson and Dr. Gipson. For consistency sake, we use Dr. Gibson, which is the spelling in the medical records.
[6] The first note reads that patient and family members "concern[ed] about length of time from 10:30 a.m. to 6:30 p.m. I informed them that we were all aware and active management." The note on the next day reads "patient sister a nurse concern about length of time 10:30 a.m. when pain in right leg began and what should have been done and when. I explain that the Doppler was done and the physical finding and 4 p.m. Dr. Gibson responded and surgery took place some where between 6-7:30 p.m. the patient having been medicated twice."
[7] During the pendency of the panel proceeding, a discovery proceeding was commended in civil district court.
[8] We denied Methodist's writ application seeking relief from the trial court's denial of its motion for summary judgment. In so doing, we noted that "there [was] some controversy concerning the nursing records and implementation of doctor's orders."
[9] Although Ms. Triss filed a jurisdictional exception to Methodist's and PCF's appeals on the basis that they were improperly seeking review of the trial court's decision denying these post-trial motions, we find this argument unpersuasive
[10] The PCF is precluded from arguing the qualified provider's fault on appeal.
[11] In support of this proposition, Methodist cites Donaldson v. Sanders, 94-1366 (La.App. 3 Cir. 7/19/95), 661 So.2d 1010. However, the Supreme Court granted writs in that case, 95-2940 (La.2/28/96), 668 So.2d 363, and the parties settled before that court rendered a decision. We thus decline to rely on that case.
[12] It is not disputed that Ms. Triss was in severe pain on three separate occasions: the first was at 9:30 a.m. in the Cath Lab and Dr. Ferdinand was called and instructed she be given pain medication. The second was at 9:55 a.m., again while she was in the Cath Lab, and Dr. Davis was called. The third was at 4:00 p.m. when she was in real bad pain.
[13] While at oral argument before this court Methodist's attorney represented that the other nurse was unavailable to be called, the record contains no proof of that fact.
[14] In January 1993, Ms. Triss returned to her job as a school secretary and continued working until she was able to retire. Ms. Triss thus is not claiming any loss wages or diminished earning capacity.
[15] On one visit, Dr. Olson testified that he could not feel a pulse in either of Ms. Triss' legs, but given that she was not exhibiting symptoms it could be assumed that she had some blood flow. He recommended that she follow-up with a vascular surgeon, but she failed to do so.